[No. 28798.   Department One.   January 18, 1943.]

TWISP MINING & SMELTING COMPANY, *Appellant,* v.
CHELAN MINING COMPANY *et al., Repondents.*[1]

[1]Reported in 133 P. (2d) 300.

*W. G. Boland,* for appellant.

*Johnson & Johnson,* for respondent Chelan Mining Company.

*Dillard & Powell,* for respondent Seattle-First National Bank, as receiver.

*Charles W. Gillespie,* for respondent Methow Gold Corporation.

JEFFERS, J.—This action was brought by Twisp Mining & Smelting Company, a Washington corporation (which will hereinafter be referred to as Twisp), in the superior court for Okanogan county, against Chelan Mining Company, a corporation, Seattle-First Na-

tional Bank, acting through its Spokane & Eastern branch, a corporation, as receiver of the Alder Group Mining & Smelting Company, a dissolved corporation, and Methow Gold Corporation, for the purpose of obtaining a decree declaring the following instruments void and of no force and effect, to wit: A deed dated January 31, 1934, executed in the name of plaintiff, conveying to Robert H. Strong the property described in paragraph five of the complaint; a deed from Robert H. Strong and wife to Chelan Mining Company, conveying the same property; a deed from Chelan Mining Company to Robert S. Lewis and Fred B. Morrill, as the surviving trustees of the Alder Group Mining & Smelting Company (hereinafter referred to as the Alder Group), conveying to such trustees the same property; a lease dated January 23, 1939, from Robert S. Lewis and Fred B. Morrill, as sole surviving trustees of the Alder Group, to Mahlon McCain and Chas. W. Gillespie; and the assignment of such lease, dated February 21, 1939, from McCain and Gillespie to Methow Gold Corporation.

Plaintiff further asked that it be decreed to be the owner, free and clear of all claims of all the defendants, of the property described in paragraph five of the complaint, excepting Alder creek, Methow, and Twisp lode mining claims, patented as survey No. 989, and as to those claims that plaintiff be entitled to the possession thereof under a contract of purchase dated November 23, 1927; that the title and possession of such property be quieted in plaintiff against the claims and demands of each and all of the defendants; that defendants be enjoined from claiming any title or interest adverse to plaintiff in the property, excepting the fee simple ownership of the Alder creek, Methow, and Twisp lode patented mining claims, the fee

simple title to which rests in the receiver of the Alder Group, subject to the possessory rights of plaintiff.

Plaintiff also asked for an accounting of the ore removed from the property.

The complaint as amended, in substance, alleged that plaintiff was the owner in fee simple of homestead entry No. 188, comprising tracts A and B, and homestead entry No. 247, embracing a portion of sections 25 and 26, in township 33 N. R. 21 E. W. M., and possessory rights under an executory contract of purchase of the Alder creek, Methow, and Twisp lode mining claims, made and entered into November 23, 1927, by and between the Alder Group, as first party, and John L. Magney, as second party, and also possessory rights in and to certain unpatented mining claims.

Title to the three patented claims, Alder creek, Methow, and Twisp lode claims, is deraigned through assignments of the contract of November 23, 1927, by John L. Magney and wife to the Alder Development Company, a corporation, under date of December 3, 1928, and subsequent assignment from the Alder Development Company to plaintiff. Title to homestead entries Nos. 188 and 247 was obtained by deed from the Alder Development Company, dated July 12, 1930, and title to the unpatented claims by deed from the Alder Development Company, dated July 12, 1930.

It is further alleged that on January 30, 1934, three members of the board of trustees of plaintiff passed a resolution to the effect that plaintiff sell, assign, and convey to Robert H. Strong, or to a corporation to be formed by him, all the right, title, and interest of plaintiff in and to the properties hereinbefore referred to, together with machinery, equipment, supplies, etc., then being used on or belonging to the property; that,

in consideration for such transfer, Mr. Strong was to have issued to plaintiff a one-tenth share of all authorized capital stock of the company to be formed by him. It is further alleged that the above resolution adopted by three trustees was void and of no force or effect, for the reason that no quorum was present authorized to transact business for plaintiff, and that the deed executed on January 31, 1934, pursuant to such resolution, signed on behalf of plaintiff by John C. Sawbridge, as president, and James O. Cull, as assistant secretary, was null and void.

It is further alleged that Mr. Strong, by reason of his presence at a meeting of plaintiff on January 17, 1934, knew that a legal quorum was not present to transact business, and that the knowledge of Mr. Strong was imputed to the Chelan Mining Company, formed by Mr. Strong to take over the property of plaintiff, and to which company Mr. Strong conveyed the property acquired by him from plaintiff on January 31, 1934.

It is further alleged that no stockholders' meeting of plaintiff was held from December 27, 1930, to April 5, 1939, at which time a new board of directors was elected, and that immediately thereafter plaintiff, acting pursuant to a resolution passed by the new directors, repudiated all attempted acts of the three directors on January 17 and January 30, 1934.

It is further alleged that the attempt to pass the resolution of January 30, 1934, authorizing the conveyance to Mr. Strong, has never been ratified by plaintiff.

It is also alleged that the Alder Group was stricken from the rolls of the secretary of state on July 1, 1922, for failure to pay its license fee, and, on July 1, 1925, was automatically dissolved for nonpayment of license fees, and, as more than ten years have elapsed from

July 1, 1925, such corporation, under existing law, could not now be reinstated.

The defendants answered separately, denying that the act of the trustees in passing the resolution of January 30, 1934, was null and void, and alleging that the act of the trustees in passing the resolution was valid, and that the deed issued pursuant thereto was in all respects valid. Defendant also pleaded ratification, estoppel, laches, and the statute of limitations.

The matter finally came on for hearing before the court on October 13, 1941, it appearing that, during the course of the trial, defendants had waived any claim made by them to a particular adjudication as to their respective rights, and the court, having denied plaintiff's motions for new trial and to reopen the case, entered judgment to the effect that plaintiff take nothing by this action and that the action be dismissed with prejudice. From this judgment, plaintiff has appealed.

Appellant makes thirteen assignments of error. The following are those which we deem material to a consideration of the questions presented: The trial court erred in holding that three members of a board of seven trustees, at an informal gathering, legally represented appellant, and had a lawful right to transact business for appellant; in holding in substance that those three trustees had power and authority to appoint an assistant secretary; in holding there was any by-law of appellant which in any way prescribed something different from that which is in the statute in regard to what constitutes a quorum; in assuming there was a legal special meeting of the board of seven trustees held January 30, 1934, in further holding that those three trustees had any power or authority to pass a resolution of any kind which would be binding on appellant, and in not holding that the acts of those

three trustees were *ultra vires* and absolutely void from their inception; in holding that there ever was any legal consummation of the illegal transaction of Robert H. Strong with the three trustees; in holding that the deed made in the name of appellant as grantor and Robert H. Strong, as grantee, on January 31, 1934, was a valid deed, and in not holding that it was a forged deed; in holding that, under the facts of this case, the doctrine of estoppel, or laches, or even ratification, is applicable or available to respondents, by reason of the fact that the deed being a forged deed, no life could be breathed into it under any circumstances; in denying appellant's motion to reopen the case for further evidence, and in denying appellant's motion for new trial; and in entering judgment dismissing appellant's action.

It may be stated that this case was not presented to this court by the same counsel who tried the case for appellant, and we assume that the briefs filed were not prepared by counsel who tried the case. We make this statement for the reason that counsel for appellant in this court makes some claim that the deed executed on behalf of appellant on January 31, 1934, was a forgery. No such claim or contention was made or presented to the trial court; in fact, no contention was made in the lower court that the then directors of appellant, or Mr. Strong, or Chelan Mining Company, acted other than in good faith. The case was tried by appellant purely upon the theory that there was no quorum of the directors present on January 17, or January 30, 1934, authorized to pass the resolution, and that therefore the resolution passed on January 17, and adopted on January 30, 1934, was null and void, and the deed executed pursuant to such resolution was also null and void. We therefore cannot

consider the claim now made in this court that the deed was a forgery.

The history of part of the property here involved starts back in about 1905, when a Mr. Lewis and associates, of Fargo, North Dakota, acquired some interest in the then unpatented Alder creek, Methow, and Twisp lode mining claims, in Okanogan county. In 1905, Mr. Fred B. Morrill, an attorney of Spokane, who had formerly lived in Fargo, purchased these claims for Mr. Lewis and associates, and thereafter, in 1906, formed the Alder Group Mining & Smelting Company as a Washington corporation. The stockholders of this company were all Fargo men, with the exception of Mr. Morrill, who took one share of stock. Patent to the above claims subsequently issued to the Alder Group in 1909.

On November 23, 1927, the Alder Group entered into an agreement with John L. Magney, whereby Alder Group, as vendor, agreed to sell to Mr. Magney, and Mr. Magney agreed to buy, the mining claims. The contract price for such property was to be three hundred thousand dollars, to be paid out of the gross values produced through smelting, refining, or other processing of the metals taken from the property. The contract also contained many other provisions relative to the work to be done on the property and payment of taxes, and provided for forfeiture upon thirty days' notice.

Apparently, Mr. Morrill had nothing to do with this property, after he had formed the corporation in 1906, until 1932, when Mr. Lewis forwarded to him the Magney contract, asking him to start proceedings to forfeit the contract, also requesting Mr. Morrill to appear and defend against labor and materialmen's liens which had been filed against the property, amounting to some ten or twelve thousand dollars.

Mr. Morrill testified that on January 19, 1932, a notice of forfeiture was served on John L. Magney, the Alder Development Company, to which Mr. Magney had assigned his contract with the Alder Group, and also on the Alder Metals Corporation, a holding company for Alder Development Company.

On August 24, 1932, Mr. Morrill brought an action in Spokane county, to cancel the Magney contract. The summons and complaint in this action was personally served on Mr. Magney, the Alder Development Company, and Alder Metals Corporation. None of these defendants appeared in the action, and thereafter the court in that proceeding entered a judgment of forfeiture, from which no appeal has been taken. Mr. Morrill stated that, at the time he started the above action, there was nothing of record showing that Twisp had or claimed any interest in the property.

We now desire to consider briefly the Alder Development Company, of which John L. Magney was president at the time the present action was begun, he having been vice-president and a director prior to that time. This Alder Development Company (which will hereinafter be referred to as Alder) should not be confused with the Alder Group Mining & Smelting Company, in which Mr. Magney had no interest.

On November 2, 1928, Mr. Magney assigned to Alder all his right, title, and interest in and to the contract he had with Alder Group. There is testimony to the effect that Mr. Magney and Alder expended considerable money on the Alder creek, Methow, and Twisp lode mining claims, in building roads, installing machinery, and doing research and other work, but the property was never brought to a point where it was producing, and it appears that, during the time the property was held by Magney and Alder, many claims were filed against it, taxes were not paid, and work

was not done in accordance with the contract of November 23rd. All these failures and others were the basis of the forfeiture action brought by Mr. Morrill.

In the late summer of 1930, Mr. Magney, representing Alder, went to Yakima, which was the home of John Sawbridge, and together they discussed the matter of forming a corporation to take over the property held by Alder and the property of an Oregon mining company, called Monumental, in which Mr. Sawbridge was interested. At this time, Mr. Magney, in addition to being a director and vice-president of Alder, had been appointed to look after the interests of the stockholders of Alder in any deal that should be made. Under the plan, the new corporation was to issue to Alder 450,000 shares of its stock for the Alder property, and 6,000 or 7,000 shares of its stock to Monumental, for its property.

Articles of incorporation of appellant were prepared by Mr. Cull, of Yakima, in August, 1930, the original incorporators being Leslie M. Rose, W. V. Coons, Harold Simonds, C. M. Hull, John Sawbridge, all of Yakima, B. F. Tilsley, of Spokane, and G. B. Richardson, of Tacoma. The articles were filed November 10, 1930. Mr. Cull acted as counsel for Twisp at all times from its beginning to April 5, 1939. All of the Yakima men above mentioned were apparently men of high standing in their community, and some of them had been or were interested in the Sunshine mine.

The first meeting of appellant, as appears from appellant's exhibit 7, which purports to be the minutes of appellant from the time of its first meeting to and including the meeting of January 30, 1934, was held in Yakima on December 27, 1930. Present at this meeting were W. V. Coons, Leslie M. Rose, John Sawbridge, Harold Simonds, and C. M. Hull. Neither Mr. Tilsley nor Mr. Richardson was present. At this meet-

ing, Mr. Sawbridge was chosen chairman, and Harold Simonds secretary. By-laws were prepared and adopted, and the following officers elected: John Sawbridge, president, B. F. Tilsley, vice-president, and Harold Simonds, secretary and treasurer. Mr. Sawbridge stated that appellant was formed for the purpose of taking over the property of Alder and Monumental, and a resolution was passed to take over these properties.

Apparently the instruments conveying the property of Alder to Twisp were brought to Yakima at this time and turned over to Mr. Cull, to be held in escrow until certain conditions had been met.

The next meeting of Twisp was on March 28, 1932, at which Sawbridge, Simonds, Coons, Hull, and Rose were present. Roy K. Magney, son of John Magney, Charles W. Julian, and John B. Hottel were also present, representing Alder. Mr. Cull informed the board that Mr. Rose and Mr. Richardson had tendered their resignations as trustees, and he also stated that he still held in escrow the instruments of conveyance of Alder.

The representatives of Alder then proposed that Twisp proceed to take over the property of Alder, in accordance with the proposition made by John Magney in 1930, regardless of whether Twisp acquired the property of Monumental or not. A resolution to acquire the property of Alder was then passed. It stated that up to that time no property had been acquired by Twisp.

It may be stated here that the authorized capital stock of Twisp was $62,500, divided into 2,500,000 shares, of the par value of two and one-half cents each.

During 1931, Mr. John Magney and Mr. Sawbridge had attempted to formulate some plan to raise money to pay off the indebtedness against this property, but without success.

After notice of forfeiture had been served on Mr. John Magney and Alder, the Magneys went to Yakima and informed the directors of Twisp that something would have to be done to save the property, and it was suggested that they forget about the Monumental stock and go ahead and take over the Alder property and issue to Alder 450,000 shares of Twisp stock; that, by transferring this property to Twisp, it would provide a background of actual property rights for Twisp, so it could go out and raise money to pay off the indebtedness against the property. A new resolution was then passed to take over just the property of Alder.

The next meeting of Twisp, as appears from exhibit 7, was on March 29, 1932, Sawbridge, Coons, Hull, and Simonds being present. Roy Magney, Julian, and Hottel were present, representing Alder. Mr. Cull reported a vacancy on the board by reason of the failure of Mr. Tilsley to qualify, and that Richardson and Rose had tendered their resignations. Motion was then made and carried by unanimous vote of the four trustees present that the resignations of Richardson and Rose be accepted, and the board proceed to fill the three vacancies caused by failure of Tilsley to qualify and the resignations of Rose and Richardson. Charles Julian, John Hottel, and Roy Magney were elected by vote of the four directors to fill the vacancies. These three men then took the oath of office and participated in the further actions of the board.

At this meeting, the plans of the company were discussed, also the obligations against the property of Alder, which was to be conveyed to Twisp. From this discussion, it appeared that it was necessary to raise at least seven thousand dollars immediately, to pay pressing claims. Julian, Hottel, and Magney were appointed as a formal committee to look after these matters. A resolution was passed to set aside 800,000

shares of treasury stock, to be sold to pay outstanding indebtedness.

We think it might be well to state here that article 5 of the articles of incorporation provides that the powers of the corporation were to be exercised through, and its business conducted by, a board of seven trustees. Section 5, article 2, of the by-laws, provides that special meetings of the board shall be held when called by the president, or by one-third of the trustees *for the time being in office.* The secretary shall give to each trustee notice by mail of each special meeting, the same to be at least one day before the meeting.

Section 6, article 2, of the by-laws, provides:

"A majority of the board of trustees, *for the time being in office,* shall constitute a quorum for the transaction of business, but, if at any meeting of the board there shall be less than a quorum present, a majority of those present may adjourn the meeting from time to time until a quorum shall be present." (Italics ours.)

As appears from exhibit 7, a notice of a meeting to be held on July 18, 1932, was given by the president. However, a meeting was not held on that date, but on August 15, 1932. Directors Julian, Hottel, and Roy Magney, by telegrams dated August 15, 1932, consented to the meeting of August 15th, which was called to consider a proposal of one Goetz to purchase stock of the company, and to consider the resignations of certain trustees and officers. Trustees present at this August 15th meeting were Sawbridge, Hull, Coons, and Simonds.

It is apparent from the minutes of Twisp that, from the formation of the company, its affairs were handled and permitted to be conducted very largely by directors Sawbridge, Coons, Hull, and Simonds, assisted by Mr. Cull, as counsel. According to Mr. Cull, the four men last above mentioned are the men with whom the Magneys consulted when they went to Yakima. John

Goetz, who proposed to purchase 1,500,000 shares of the capital stock of Twisp, had been brought to Yakima by some member of the Magney-Julian-Hottel finance committee. Mr. Cull testified that, as a part of the Goetz deal, Hottel and Julian were to retire from the board, and Goetz and one MacDonald were to be elected trustees in their places. Mr. Hottel and Mr. Julian did tender their resignations as trustees, and such resignations were accepted, the four trustees voting. Mr. Goetz was then elected to fill the vacancy caused by the resignation of Hottel, and Frederick C. MacDonald to fill the vacancy of Julian. Mr. Sawbridge tendered his resignation as president, to take effect at the close of the meeting, and Mr. Goetz, who apparently was not present at this meeting, was elected president, to take effect upon his qualifying as a trustee. Mr. Cull was ordered to forward to Mr. Goetz and Mr. MacDonald proper forms of oath.

It is one of the contentions of appellant that, as the result of this meeting, Mr. Goetz and Mr. MacDonald were elected and became trustees, and Mr. Goetz president, regardless of the fact, as Mr. Cull testified, that neither of them ever took the oath as a trustee, never qualified in any way as a trustee, and never attended a meeting of Twisp or participated in any meeting as a trustee or officer, and regardless of the fact that it seems to be undisputed that Mr. Cull was never able to get in touch with Mr. Goetz, and that shortly after this time he seems to have passed out of the picture and his whereabouts were not known.

As appears from exhibit 7, the next special meeting of Twisp was called for January 17, 1934. During the time between the last meeting, held August 15, 1932, and this meeting, efforts had been made by the finance committee of Twisp to raise money to pay off the pressing claims against the property, but without suc-

cess, and Twisp had just marked time, in so far as any development work on the property was concerned. During this time, Mr. Robert H. Strong, of Portland, had been contacted, and he finally made a proposition to Twisp, and a special meeting was called for January 17, 1934, to consider his plan, which in general was that Twisp convey to Mr. Strong, or to a corporation to be formed by him, the properties of Twisp, and as consideration of such transfer, there would be issued to Twisp one-tenth of the capital stock of the company to be formed by Mr. Strong. In addition, Mr. Strong agreed to negotiate for and attempt to acquire any and all adverse outstanding rights and interests in the property.

According to exhibit 7, at the meeting in the morning of January 17th, a quorum was not present, and the meeting was adjourned to eight p. m. of the 17th. At the evening meeting, John Sawbridge, president, presided, and in the absence of the regular secretary, Harold Simonds, Mr. Cull acted as secretary *pro tem*, the by-laws providing for such *pro tem* appointment. Trustees present were Sawbridge, Coons, and Hull. Mr. Cull reported that there were two vacancies on the board, due to the failure of Mr. Goetz and Mr. MacDonald to qualify as trustees. Mr. Cull further advised the board that neither Mr. Goetz nor Mr. Mac-Donald had participated in any meeting or proceeding in connection with company business. He also advised the board it was not necessary to fill these vacancies at that time, as there were five qualified trustees, namely, Sawbridge, Coons, Hull, Simonds, and Roy Magney. A resolution was then passed, declaring that two vacancies existed on the board by reason of the failure of Goetz and MacDonald to qualify as trustees.

Mr. Strong was present at this meeting, with his attorney, Mr. Cole. Mr. Strong submitted his proposi-

tion to the board, and after discussion a resolution was passed, accepting Mr. Strong's offer. The following paragraph of the resolution shows to some extent the condition of Twisp and its inability to finance or develop this property as of January 17, 1934:

"WHEREAS, since its organization and the acquisition by it of the said mining property and property rights, the company has not been able to finance the development and operation of said property or to comply with the terms and conditions of certain instruments upon the performance of which its right to certain portions of said property depends; and the company now owes matured obligations in an amount in excess of $6000.00, which it is unable to meet or discharge . . ."

The resolution further provided that the conveyance from Twisp should be executed by the president and attested by the secretary or assistant secretary.

Mr. Cull reported that he had received a telegram from Harold Simonds, consenting to the holding of this special meeting, and endorsing the action taken by the trustees present. A motion was then made and carried by the unanimous vote of the trustees present that a special meeting of the board of trustees be called by the president, upon written notice mailed to all members of the board at their last known addresses, at least eight days prior to the date of such meeting; that such meeting be called for January 30, 1934, at the hour of two p. m.; and that, at such meeting, the proposition of Mr. Strong, the action thereon at this meeting, and the resolution relating to such proposition, as adopted at this meeting, be submitted for acceptance, approval, and ratification by the board of trustees.

A notice of the meeting of January 30, 1934, signed by John C. Sawbridge, as president, dated January 19, 1934, to which was attached a copy of the resolution passed at the January 17th meeting, was mailed to each of the five directors, at his last known address, on

January 19, 1934, as appears from the affidavit of James O. Cull.

On January 20, 1934, Harold Simonds wrote on the copy of the notice received by him the following:

"I shall be unable to attend the meeting referred to in the notice; but I hereby approve, ratify, and confirm the foregoing resolution to be adopted at said meeting, the same as if I were personally present and voted affirmatively for its adoption.

"Asotin, Wash., January 20, 1934.

"(Signed) HAROLD SIMONDS."

Mr. Cull testified that he tried to locate Roy Magney, writing several letters, and on January 23rd, he was informed that Mr. Magney's address was Denver. On January 24th, he mailed to Mr. Roy Magney, at this address in Denver, a copy of the notice of the meeting of January 30th, together with a copy of the resolution. Apparently, this notice to Mr. Magney was in addition to the one mailed on January 19th. While on the stand, Mr. Magney admitted that he received the notice and a copy of the resolution at Leadville, Colorado, three days after the meeting.

It might be well to here again call attention to section 5, article 2, of the by-laws, which provides that special meetings may be called by the president, and the secretary shall give notice of each special meeting by mail, the same to be at least two days before the meeting, or by telegraph at least one day before the meeting.

We now come to the special meeting of January 30, 1934, at which meeting the following trustees were present: John Sawbridge, C. M. Hull, W. V. Coons. The matter of filling the vacancies on the board caused by the failure of Goetz and MacDonald to qualify was again discussed, and a motion was made and carried that the vacancies be not filled at that time, as there were five trustees qualified to act.

A motion was then made and carried by the unanimous vote of the three trustees, namely, Mr. Sawbridge, Mr. Hull, and Mr. Coons, they being a majority of the five trustees then constituting the board, that the resolution passed at the meeting of January 17, 1934, be adopted. The resolution was adopted, the three trustees voting for adoption. This resolution contained a provision appointing Mr. James O. Cull assistant secretary, with full power to act, and purporting to give to Mr. Cull specific power and authority to execute any and all instruments required by the resolution for transfer of the Twisp property adopted at this meeting, and to affix the corporate seal. The appointment of Mr. Cull as assistant secretary was made pursuant to section 1, article 3, of the by-laws, which provides that, in addition to the officers therein named, the trustees shall have authority to provide for other officers.

It was pursuant to this resolution that Mr. John Sawbridge, as president, and Mr. James Cull, as assistant secretary, executed and delivered to Mr. Strong the deed of January 31, 1934, here in question.

Mr. Strong formed the Chelan Mining Company, pursuant to his agreement with Twisp; and, after the conveyance by Mr. Strong and wife to Chelan Mining Company, that company issued to Twisp 250,000 shares of its stock, which were delivered to Mr. Cull and receipted for by him. Twisp still holds this stock.

Chelan Mining Company (hereinafter referred to as Chelan) went into possession of the property acquired from Twisp, and, very largely acting through Mr. Strong, proceeded to pay off and settle the claims against the property. It appears without dispute that Chelan expended a considerable sum of money, in addition to stock issued in settling claims, paying taxes due and for assessment work. Mr. Strong, on behalf

of Chelan, made many trips in an attempt to interest certain mining interests in the development of the property, and, while some of these parties investigated the property, they refused to invest. Chelan also, on October 8, 1934, apparently feeling that the Magney contract of November 23, 1927, had been forfeited, or at least that it was doubtful what title to the Alder creek, Methow, and Twisp lode mining claims had been acquired under that contract, entered into a new contract with the Alder Group.

During the time Chelan held this property, the company was contacted by Mr. John Magney, as appears by Chelan's exhibit 30, which consists of a series of letters and telegrams covering the period from October 17, 1935, to June 5, 1936. These letters indicate that Mr. Magney had made to Mr. Strong, for Chelan, a proposition to take over its property; in fact, Mr. Magney had a contract drawn for that purpose. However, Mr. Magney was not able to meet the requirements of Chelan, and the deal fell through. Mr. Roy Magney, who it will be remembered was a director of Twisp, contacted, or at least attempted to contact, Mr. Strong on behalf of his father, John Magney, during the above period.

It also appears from exhibit 31, consisting of a series of letters and telegrams, covering a period from April, 1931, to April, 1937, that Roy Magney and two associates obtained a contract on this property. This contract, dated March 16, 1937, was forfeited and canceled, for the reason, as testified by Roy Magney, that they could not comply with its terms.

Up to this time, no objection had been made by John Magney or Roy Magney, or any director or stockholder, to the Twisp deed to Mr. Strong, or any of the proceedings leading up to the execution of that deed, although the books of Twisp had been available, the deed from

Twisp was of record, and Chelan had been in possession of the property.

It appears that the first time any objection was made to the meetings of January 17 and 30, 1934, and the deed of January 31, 1934, was in February, 1938, when John Magney went to Yakima, with his attorney, and called a meeting of the directors, at which he made the claim that the transfer to Mr. Strong was not valid, and told Twisp that if it did not start an action to set aside the transfer, he would. Roy Magney was also present at this meeting. Apparently, after the transfer of January 31, 1934, Twisp had again just marked time, and had allowed its license fees to become delinquent, as it had been stricken by the secretary of state for failure to pay its license fees.

Up to this time, the stock which Twisp was to issue to Alder had never actually been issued, and, at this meeting, John Magney asked that the 450,000 shares of stock be issued to Alder. Mr. Cull stated that at that time Twisp could be reinstated. So far as shown by the minutes of Twisp, after its purchase of the Alder property the only stockholders of Twisp were the Alder Development Company, which was entitled to 450,000 shares of stock, and the acting directors, who each had one hundred shares. Mr. Cull testified that John Magney, or Roy Magney, or both, represented Alder.

Respondent Methow Gold Corporation is claiming rights to the possession of this property under and by virtue of a quitclaim deed dated January 17, 1929, from Chelan Mining Company to Robert S. Lewis and Fred B. Morrill, sole surviving trustees of the Alder Group Mining & Smelting Company, a lease from Robert S. Lewis and Fred B. Morrill, as such trustees, to Mahlon McCain and Charles W. Gillespie, dated January 23, 1939, and an assignment from Gillespie and

McCain of their interest in the lease, dated February 21, 1939, to Methow Gold Corporation, and an agreement entered into between the receiver of the Alder Group and Methow Gold Corporation, dated July 27, 1939.

Going back again to Twisp, it appears from appellant's exhibit 16 that the next meeting of Twisp, after January 30, 1934, was a stockholders' meeting held at Yakima on April 5, 1939, attended by the following persons: James O. Cull, Roy Magney, Roy D. Huston, John C. Sawbridge, K. H. Blaesser, Hugh M. Gano, John L. Magney, E. J. Keogh, and N. Beglar. Roy Magney was appointed chairman of this meeting, and Blaesser, secretary. It was disclosed that no stockholders' meeting had been held since the corporation was formed in 1930. It was also disclosed that there were outstanding 455,500 shares of stock. The stock represented at this meeting was as follows:

```
    100 shares—John C. Sawbridge
     40 shares—Roy K. Magney
     10 shares—Roy D. Huston
     10 shares—N. Beglar
     10 shares—Hugh M. Gano
     10 shares—E. J. Keogh
     10 shares—J. L. Magney
     10 shares—K. H. Blaesser
450,000 shares—Alder Development Company, by John L.
               Magney, president.
```

Stock issued and not represented:

```
  5,000 shares—John B. Hottel
    100 shares—Harold Simonds
    100 shares—C. M. Hull
    100 shares—W. V. Coons
```

At this meeting, the following directors were elected: John L. Magney, Roy K. Magney, K. H. Blaesser, E. J. Keogh, Hugh M. Gano, Roy D. Huston, and N. Beglar. A meeting of the directors was held immediately after the stockholders' meeting, and the following offi-

cers elected: John L. Magney, president, Roy K. Magney, vice-president, and K. H. Blaesser, secretary and treasurer.

On April 24, 1939, at an adjourned meeting of the directors held in Spokane, to which place the office of the company had been removed, the following members of the board were present: John L. Magney, E. J. Keogh, K. H. Blaesser, Hugh M. Gano, and Nellie M. Beglar. At this meeting, the new directors disapproved all the acts of the old directors relative to the meetings of January 17 and 30, 1934, pertaining to the resolution authorizing a conveyance to Mr. Strong, and authorized the new board to take legal steps to set aside the deed of January 31, 1934, and to recover possession of the property.

While it does not appear definitely that the minutes of Twisp, as shown by exhibits 7 and 16, are all the meetings that were held, the minutes as shown by these exhibits are all that are before us. From these minutes, it does not appear when or in what manner John Magney, Roy Huston, E. H. Blaesser, Hugh Gano, E. J. Keogh, and N. Begler became stockholders in Twisp, as they were not stockholders on January 30, 1934, as shown by exhibit 7. It is interesting to note that each of the last named stockholders had ten shares of stock in Twisp, the par value of which was two and one-half cents a share. It is also apparent that, in this last setup of Twisp, John Magney is the dominating figure.

It may also be noted that the above action by Twisp was not authorized until more than five years after the deed from Twisp to Mr. Strong, on January 31, 1934, and not until after the Methow Gold Corporation had taken possession of the property and were shipping ore.

While argument is made in appellant's brief that the

deed of January 31, 1934, was a forgery, and other statements are made which would seem to question the good faith of the old directors and Mr. Strong, we desire to state again that the complaint contains no allegation of fraud or unfair dealing or conspiracy on the part of anyone connected with the Strong transaction, but, to the contrary, it appears from the statement of facts that counsel who represented appellant at the trial of this action disclaimed any such contention, resting his case entirely on the theory that the deed was void, because there was no quorum of the directors present at either the meeting of January 17 or January 30, 1934, when the resolution was passed authorizing the transfer to Strong.

Since the execution and delivery of the deed from Twisp to Chelan, the latter company, or its survivors in interest, have been at all times, and are now, in possession of the property, and have been improving it, and extracting and shipping ore.

We are convinced that the acting directors of Twisp in 1934 acted in good faith, and concluded there was nothing that could be done by them to finance the development of this property. Outstanding claims were pressing, taxes had not been paid, assessment work had not been done, and no attempt had been made to comply in any way with the Magney contract of November 23, 1927. All attempts of the directors, as well as those of John Magney, to finance this proposition had failed.

With this condition of affairs present, Mr. Strong came forward and offered to turn over to Twisp 250,000 shares of stock in the company to be formed by him, and offered to attempt to obtain a settlement of all outstanding claims and interests against the property. The deal was made, and Chelan complied in every respect with the agreement made by Mr. Strong.

Considerable is said in appellant's brief about the failure to call a stockholders' meeting. In answer to this, it may be said that there was in fact no stock actually issued other than possibly to the then directors of Twisp, until just before the meeting of April 5, 1939, when the stock to Alder was issued, so that the meeting of the directors was, in fact, a meeting of the stockholders, with the exception of the stock to which Alder was entitled, but which, as we have said, had not actually been issued, and we are convinced that Alder had notice of all that was done, through Roy Magney, or John Magney, or both.

Whatever term may be given to this action, it is evident that, unless the deed from Twisp to Mr. Strong, of January 31, 1934, be declared null and void, appellant cannot prevail.

The first question, then, to be considered is whether or not the deed of January 31, 1934, was valid, and transferred to Mr. Strong the interest of Twisp in the property.

Appellant contends that the articles of incorporation provide that the business of the company must be conducted by a board of seven directors, and that, since the resolution of January 17 and 30, 1934, was passed and adopted at a meeting where only three directors were present, a legal quorum of directors was not present to hold a meeting or pass such a resolution, and that the deed executed pursuant to such resolution was therefore a nullity, and did not bind Twisp. All the respondents contend this was a valid deed.

It is true the articles do provide the powers of the corporation shall be exercised through a board of seven trustees. It is also true that the articles do not say how many trustees shall constitute a quorum to transact business. However, section 6, of article 2, of the by-laws, provides that a majority of the board of

trustees, *for the time being in office,* shall constitute a quorum for the transaction of business. We are satisfied that neither Mr. Goetz nor Mr. MacDonald were trustees of Twisp on January 17 or 30, 1934. They had never qualified as trustees, and their offices had been declared vacant.

This being true, there were on January 17 and 30, 1934, only five trustees of Twisp who were qualified to act, namely, Mr. Sawbridge, Mr. Coons, Mr. Hull, Mr. Simonds, and Roy Magney, and respondents contend, we think correctly, that there being only five trustees "then in office," three of them constituted a quorum to transact business, under section 6, article 2, of the by-laws, and that the acts of the three directors were valid acts of the board and bound the corporation.

Appellant further contends that to so construe section 6, of article 2, of the by-laws, would be contrary to the articles of incorporation, and also contrary to the provisions of Rem. Rev. Stat. (Sup.), § 3803-31, [P. C. § 4503-131] paragraph III, subd. d, which provides:

"A majority of the board of directors shall be necessary to constitute a quorum for the transaction of business, and the acts of a majority of the directors present at a meeting at which a quorum is present shall be the acts of the board of directors."

While appellant quotes the provisions of subd. d above set out, it does not quote all of paragraph III. This paragraph starts out with the following statement:

"The number, qualifications, terms of office, manner of election, time and place of meeting, and the powers and duties of the directors may, subject to the provisions of this act, be prescribed by the articles or by-laws. *Except as otherwise prescribed in the articles or by-laws:* . . ." (Italics ours.)

Then follow certain subdivisions, among them subdivision d, quoted by appellant.

Appellant does not contend that there was anything wrong in temporarily having only five trustees, but does contend that to have a quorum present there must be a majority of seven trustees present, and not a majority of the five then in office.

In view of the fact that the articles contained no provision relative to a quorum, we are of the opinion it was within the power of the corporation to pass a by-law prescribing the number of directors necessary to constitute a quorum for the transaction of business, unless such by-law was in conflict with Rem. Rev. Stat. (Sup.), § 3803-31, paragraph III.

We are of the opinion that the section last above cited does not help appellant, for, as we read that section, subdivision d, quoted by appellant, would not apply where the corporation, in either its articles or by-laws, had provided what should constitute a quorum, as was done in this case.

Appellant argues that the overwhelming weight of authority, as stated in Fletcher's Cyc. of Corporations, vol. 2, p. 168, § 392, is that, when the power to do particular acts, or general authority to manage the affairs of a corporation, is vested in a board of trustees, they are vested in the trustees not individually, but as a board, and the trustees can act so as to bind the corporation only when they act as a board and at a legal meeting. Appellant states that the rule and the reasons therefor are well stated in *Ames v. Goldfield Merger Mines Co.*, 227 Fed. 292. We may admit the above rule is a correct statement of the law, but we fail to see where it is applicable here.

The meetings of January 17 and 30, 1934, were regularly called special meetings. The directors met as a board, and a quorum of the directors *then in office being present,* proceeded as a board to transact the

business of the corporation, referred to in the notice given of such meetings.

It is also contended by appellant that the effect of what the trustees did was to change the number of trustees from seven to five, and that this could not be done, as this power was vested in the stockholders.

We do not believe there was any attempt by the directors in this case to change the number of trustees. For various reasons, there had been vacancies on the board of trustees. Some of the vacancies had been filled or attempted to be filled, but at the time of the meetings of January 17 and 30, 1934, there were two vacancies on the board, leaving but five trustees.

It seems to us perfectly plausible and reasonable that a situation such as here presented was contemplated at the time the by-laws were passed.

The next reference to Fletcher's Cyc. of Corporations is vol. 2, page 206, § 421, from which appellant quotes. This quotation is not applicable here, for the reason that it covers a situation where the by-laws provide *"that a majority of the directors* shall be necessary and sufficient to constitute a quorum," not a majority of the trustees then in office, as in the instant case.

A careful study of Fletcher will, in our opinion, reveal that the text recognizes that the number of directors of a corporation necessary to constitute a quorum may be fixed by the by-laws, if not incompatible with the articles or statutory law, and that a majority of that quorum may decide any question coming properly before such meeting, although the number of directors present may be less than a majority of the entire board. Fletcher's Cyc. of Corporations, vol. 2, p. 210, § 425. See, also, 13 Am. Jur. 918, § 960, where the rule is stated as follows:

"Stating the rule in terms of necessity, it is equally well settled that a majority of the directors must be

present at a meeting to constitute a quorum and enable the board to act and bind the corporation, *unless the power is given to a lesser number.* This is also the rule embodied in the Uniform Business Corporation Act." (Italics ours.)

The authority cited by appellant does not purport to deal with a corporation which has a by-law such as we have in the instant case, and a discussion of such authority would therefore serve no purpose.

Having determined as a fact that there were but five trustees in office on January 17 and 30, 1934, whether or not a majority of that five constitutes a quorum is dependent entirely upon the interpretation of the section of the by-laws hereinbefore referred to, considered in connection with the articles and the statutory law. Having been cited to no authority that would prohibit a corporation from passing such a by-law, under conditions such as herein set out, we are of the opinion it was valid, and that the three directors, present and voting at the meetings of January 17 and 30, 1934, constituted a majority of the board then in office, that their acts were the valid acts of the board, and that the deed issued pursuant to the resolution adopted at the meeting of January 30, 1934, was a valid deed of the corporation.

We are also of the opinion that, under the facts of this case and the law applicable thereto, appellant is now estopped from questioning the validity of the deed. It should be kept in mind at all times, and especially in answering this question, that there is no claimed fraud, unfair dealing, or conspiracy. It should also be kept in mind that director Simonds consented to and ratified the action of the board, and while in our opinion it was not necessary to have the vote of Mr. Simonds to constitute a quorum, and while Mr. Simonds was not personally present at either the meet-

ing of January 17th or January 30th (and we are not holding that he should be considered as present at those meetings), there can be no doubt that he did all that was possible for him to do to ratify the acts of the board, the same as he would have done if present.

It will also be remembered that Roy Magney, the fifth member of the board, was notified of the meeting of January 30th, which notice, together with a copy of the resolution, were received by him at Leadville, Colorado, three days after the meeting, but mailed six days before.

Twisp received and still has the 250,000 shares of stock of Chelan. The deed from Twisp to Chelan was recorded in February, 1934, and has at all times been constructive notice of the transfer therein described. Chelan and its successors in interest have been at all times in possession of the property, and have expended large sums of money in improving and working the property, and in paying claims against it, taxes, and for assessment work. Twisp has not offered to pay back any of the sums so expended.

No objection to the Strong transaction has ever been made by any director or stockholder of Twisp, except the protest made by John Magney in 1938, and this was after John Magney and Roy Magney had attempted to get contracts on the property from Chelan.

While appellant contends that the acts of John and Roy Magney were their individual acts, and while they denied that they knew, prior to 1938, that only three directors had authorized the execution of the deed in question, we state frankly that we are unable to believe this could be true. At any rate, we are of the opinion that they had such notice as to put them on inquiry, and that, under the facts in this case, the notice of John and Roy Magney was imputed to Alder.

We are satisfied that both Roy and John Magney

knew, or should have known, of this by-law, Roy Magney because he was a director, and John Magney because of his connection with the formation of Twisp and his subsequent dealings with it as representative of Alder.

Some contention is made that Mr. Sawbridge was not president of Twisp at the time the deed of January 31st was executed, but that Mr. Goetz was president. We have hereinbefore held that Mr. Goetz never became a trustee of Twisp, and therefore never became president. Mr. Sawbridge, who had been president prior to December 15, 1932, continued to act as president, without objection, and was at least a *de facto* officer, if not a *de jure* officer.

We have consistently held that, where a corporation allows a person in a large measure to control its business transactions, the corporation must be held responsible for his acts in the name of the corporation, until it has been affirmatively shown that such acts were unauthorized. *McKinley v. Mineral Hill Consolidated Mining* Co., 46 Wash. 162, 89 Pac. 495. In the cited case, we also held that, when a corporation receives the benefits of a transaction, it will not be heard to say that it neither authorized nor ratified the transaction.

Appellant contends that the acts of the three directors were *ultra vires*, and therefore void; and, being void, such acts could not be ratified or the company estopped from questioning the validity of the deed.

In the first place, the acts of the three directors in passing the resolution of January 30, 1934, and the execution of the deed were not acts *ultra vires* the corporation, for clearly the corporation was not prohibited from passing such a resolution or from executing such a deed. The term *"ultra vires,"* in so far as it applies to corporate transactions, is used to describe corporate

transactions which are outside the objects for which the corporation was created, as defined in the law of its organization, and therefore beyond the power conferred on the corporation by the legislature. 19 C. J. S. 419, § 965; 13 Am. Jur. 784, § 754.

■ The general rule is that a corporation must act in the manner and with the formalities, if any, prescribed by its charter, or by the general law. However, a corporate transaction or contract which is within the corporate powers, which is neither wrong in itself nor against public policy, but which is defective from a failure to observe in its execution a requirement of law enacted for the benefit or protection of a certain class, is voidable only, and is valid until avoided, not void until validated. 19 C. J. S. 423-4, § 968.

■ Where the corporation has power to enter into the transaction or contract, neither party to it, who has had the benefit of it, can set up as a defense that the legal formalities were not complied with or that the power was improperly exercised, 19 C. J. S. 424, § 968. The corporation will be estopped to deny that it did contract in the manner provided by statute as against other persons who have acted on the assumption that the corporation has done what the law said it should do, and this is particularly true when the corporation retains the benefits of the transaction. 19 C. J. S. 424, § 968.

In *Millett v. Mackie Mill Co.,* 193 Wash. 477, 76 P. (2d) 311, after stating

"We have consistently held that the defense of *ultra vires* is not available to a corporation that has received, directly or indirectly, the benefits of the contract [citing many cases],"

we said:

"We feel that the proper rule to be applied to this case is as is found in 3 Fletcher Cyc. Corp. (1917) 2616:

" 'If the corporation which has entered into an ultra vires contract has received no benefits from the partial or full performance of the contract by the opposing party; it is not estopped to plead ultra vires.' "

It will thus be seen that in this state a corporation is estopped from claiming that an act was *ultra vires* the corporation where the contract was partially or fully performed by the other party, except in a case where it received no benefits from the transaction.

In the instant case, the transaction, in any event, was not *ultra vires* the corporation, and the corporation received 250,000 shares of stock in Chelan.

Many other cases might be cited to sustain our conclusion that Twisp and its present stockholders should, under the facts in this case, now be estopped from questioning the validity of the deed in question. It is difficult to find cases which are factually exactly like the instant case, or in many instances like any given case, but the facts in the cases cited are such as to justify us in holding that the principle therein announced is applicable to the facts in the instant case. *Stilwell v. Merriam Co.*, 127 Wash. 116, 219 Pac. 836; *Keyes v. Citizens State Bank*, 128 Wash. 658, 224 Pac. 2; *Belcher v. Webb*, 176 Wash. 446, 29 P. (2d) 702; and *Millett v. Mackie Mill Co.*, *supra*, and cases therein cited.

We also call attention to the discussion of this subject in the early case of *Kirwin v. Washington Match Co.*, 37 Wash. 285 at 287, 79 Pac. 928.

While we are of the opinion the acts of the directors of Twisp in passing the resolution of January 17 and 30, 1934, and the execution of the deed of January 31, 1934, were ratified by the corporation and its then stockholders, we have not deemed it necessary to discuss this question, in view of our conclusion on the other questions presented.

For the reasons herein assigned, the judgment of the trial court is affirmed.

ROBINSON, STEINERT, MILLARD, and MALLERY, JJ., concur.

March 26, 1943. Petition for rehearing denied.