72 A.2d 446 (1950)
WILMINGTON PROVISION CO.
v.
SINSKEY.
Court of Chancery of Delaware, New Castle.
March 22, 1950.
Henry A. Wise, Jr. (of Hastings, Stockly, Walz & Wise), of Wilmington, for plaintiff.
David F. Anderson (of Southerland, Berl & Potter), of Wilmington, for defendant.
HARRINGTON, Chancellor.
Wilmington Provision Company, a corporation of this State, seeks to have this court set aside a judgment for $50,000 entered against it by one R. Abbott Sinskey in the Superior Court for New Castle County on January 25, 1948. The judgment was entered against the plaintiff by confession on a demand note under seal, dated May 7, 1948, payable to the order of R. Abbott Sinskey, containing a joint and several warrant of attorney for the confession of judgment, and signed by "Abe E. Goldman" and "Wilmington Provn. Co., Abe E. Goldman, President." Prior to May, 1948, one Sol Spiegel, a resident of Philadelphia and a member of the bar of that city, was the record owner of 2493½ of the 2506½ shares of the outstanding common and voting stock of Wilmington Provision Company. There was also an outstanding issue of preferred and nonvoting stock having a par value of $100.00 per share, but the precise number of shares does not clearly appear. Spiegel was the president of the corporation and he and his wife, Ena Spiegel, were its only directors and officers, although a board of four members seems to have been contemplated by its bylaws. By contract dated March 1, 1948, Sol Spiegel agreed to sell his stock to Abe E. Goldman at a specified price, and purported to employ him as general manager of the corporation at a substantial salary, to be paid weekly from the corporate funds. The contract provided further (1) that Goldman should have charge of "the managing of the affairs of the corporation both as to hiring and firing of employees and the countersigning of checks with any one of the officers of the corporation", and (2) that he should have the right to "borrow any funds necessary for the operation of the business of the corporation without first obtaining the permission of the officers or Board of Directors of the corporation, provided, however, that such permission shall be necessary during the first ninety (90) days after the signing of this agreement." During that period, Goldman was to make a substantial payment on account of the purchase price of Spiegel's stock. There is no evidence that this contract was passed on at any meeting of the directors of Wilmington Provision Company, but Goldman immediately acted as its general manager.
Shortly thereafter, Goldman together with Spiegel called on Sinskey, the president of the Colonial Trust Company in Wilmington, *447 and discussed with him his desire to borrow the needed funds to purchase Spiegel's stock. The evidence indicates that Goldman then introduced Spiegel as president of the corporation and himself as vice-president. Sinskey at least expressed interest in Goldman's problem and told him about other financing he had been able to arrange.
Wilmington Provision Company had judgment debts of approximately $244,000, and shortly after Goldman's visit to Sinskey's office a group of preferred stockholders filed a complaint for the appointment of a receiver for the corporation. Its allegations do not clearly appear, but the inference is that insolvency was alleged. No creditors or holders of common stock seem to have joined in the suit and it was later dismissed apparently on the motion of the plaintiffs and without opposition. One of the judgments entered against the corporation was for $204,000 and was held by a local bank which was demanding payment.
Goldman had faith in the business prospects of the corporation and still wished to acquire control of it through the purchase of Spiegel's common stock. A number of the preferred stockholders were willing to sell their shares at a 50% discount, and Goldman deemed it advisable to purchase as much of that stock as possible, as well as the thirteen shares of common stock not owned by Spiegel, in order that he might be the virtual owner of the corporation. He also realized that it would be necessary to refinance the corporate debts. He did not have the necessary funds to carry out these plans and sought Sinskey's assistance.
Through Sinskey's efforts Walter E. Heller and Company of New York and Chicago was induced to make a survey of the affairs of Wilmington Provision Company and subsequently offered to make it a factors loan of $341,000 to be used to pay its judgment debts and for other corporate purposes. The amount to be advanced under this plan was to be based partly on the inventory, but all present and future accounts receivable were also to be transferred to Heller and Company to aid in securing the loan. It was clearly understood, however, that no money would be advanced until Goldman had acquired control of the corporation.
Sinskey undertook to raise approximately $200,000 for Goldman to enable him to purchase the capital stock as planned. He first assured Goldman that he could procure the money from a named Philadelphia bank, but when the time came did not produce it claiming that it was not needed in view of the substantial amount Heller and Company was willing to advance to the corporation.
Heller and Company consented to reduce the amount of its contemplated loan, based on the corporate inventory, by $100,000. Spiegel then assured Goldman that he could secure $100,000 for him from one Marti but a $20,000 bonus would be required, to which Goldman agreed. The entire transaction was to have been consummated on May 7, 1948. More than $100,000 was required to purchase Spiegel's stock, but the evidence does not disclose how the remaining sum, even for the purchase of that stock, was to be raised.
On May 6, an unsigned and uncertified paper, in the form of a resolution of the board of directors of Wilmington Provision Company, bearing that date, was prepared by Spiegel and handed to Goldman's attorney, and was also shown to Sinskey and to the representative of Heller and Company. It purported to show that Sol Spiegel and Ena Spiegel had resigned as directors and officers of the corporation, that Abe E. Goldman and Sidney Fruchbaum had been elected in their places, and that Goldman had been elected president of the corporation.
On the evening of May 6, the required papers to secure the contemplated loan to the corporation were signed by Abe E. Goldman, as president, and delivered to the representative of Heller and Company. Two certified checks were then delivered to Sinskey for deposit with the Colonial Trust Company under an escrow agreement, stating the purposes for which the money was to be used including the payment of the judgment debts. This agreement was signed by Goldman as president of Wilmington Provision Company and the *448 checks, payable to the corporation, were endorsed by him as president.
Prior to May 8, 1948, Goldman by an oral agreement promised to pay Sinskey $50,000 for his services if he could procure the necessary funds to acquire the stock of the corporation and to refinance its debts. Payment from corporate funds seems to have been contemplated. Neither Spiegel nor the representative of Heller and Company had been informed of this agreement and Sinskey had repeatedly cautioned Goldman not to tell them about it. Goldman claims that this sum was to be paid at the rate of $10,000 a month and this is corroborated by the fact on the evening of May 6 Sinskey had Goldman, as president of the corporation, sign a memorandum to that effect. He also had him sign, both individually and as president, the $50,000 note on which judgment was entered and two notes payable to Marti, one for $100,000 and the other for $20,000. Late on the night of May 6, or early in the morning of May 7, Sinskey finally told Goldman that he would not furnish the money that was to be advanced by Marti unless his fee of $50,000 was paid at once in cash. Goldman could not pay that sum. He offered to deed Sinskey his house in New Jersey if the entire transaction could be put through, but Sinskey still demanded cash. He had previously told Goldman that a considerable part of the $50,000 had to be paid to others, including Heller and Company's representative. Finally Goldman telephoned Heller and Company's agent and told him about his agreement to pay Sinskey and that he was demanding cash. Heller's agent denied that he was to receive any part of the payment demanded. After telephoning to Chicago for instructions, he refused to go on with the intended factors loan to Wilmington Provision Company and demanded the return of the certified checks held in escrow. This was subsequently done and Goldman as president of Wilmington Provision Company signed a release to Heller and Company. Sinskey had no further connection with any of the affairs of the plaintiff corporation and performed no services which were accepted by it.
Shortly after May 7, Spiegel concluded to sell his common stock in Wilmington Provision Company to Goldman on credit, with a down payment of $20,000 which Goldman raised and paid. The balance due was secured by Goldman's note, endorsed by Spiegel, payable at a Philadelphia bank. The stock was transferred to Goldman on the records of Wilmington Provision Company on May 12, 1948, and was pledged at the bank to secure the payment of his note. On the same day Sol Spiegel and Ena Spiegel resigned as directors of the corporation and Abe E. Goldman and Sidney Fruchbaum were elected in their places; Goldman was elected president and Fruchbaum secretary. After Goldman had acquired Spiegel's stock, Heller and Company made a factors loan to Wilmington Provision Company and its judgment debts were paid from that fund. Goldman then borrowed on his personal note $103,000 from the corporation and purchased the remaining outstanding shares of common stock and 70% of its preferred stock. He agreed, however, that Wilmington Provision Company could purchase the stock at any time at the price he had paid and in order to retire it.
The execution and delivery of the bond, on which the $50,000 judgment attacked was confessed, was not a corporate act and Sinskey knew it. He knew that Goldman would only become president of Wilmington Provision Company by purchasing Spiegel's stock, and that he had not acquired it at that time. He knew that the paper dated May 6, 1948, in the form of a resolution of the board of directors of Wilmington Provision Company was not a record of corporate action, but was merely intended to show what would appear on the minutes if Goldman should purchase the stock as expected. Sinskey knew that Goldman's signature as president of Wilmington Provision Company on the escrow agreement, on the factors loan agreement, and in endorsing the Heller and Company checks payable to the corporation, was merely in anticipation of his acquiring the stock and his election to that office. Whatever Goldman's reason may have been for signing the *449 release as president of the corporation on the subsequent return of the certified checks to Heller and Company, it does not affect the conclusion that he did not hold that office and was not an authorized agent of the corporation at the time the $50,000 bond was executed.
A corporation can seldom deny the validity of a contract made in its name by an alleged unauthorized agent if it has accepted its benefits. Twisp Mining & Smelting Co. v. Chelan Mining Co., 16 Wash.2d 264, 133 P.2d 300; Cunningham v. German Insurance Bank, 6 Cir., 101 F. 977; Kanneberg v. Evangelical Creed Corp., 146 Wis. 610, 131 N.W. 353, 39 L R.A.,N.S., 138, Ann.Cas.1912C, 376; see also 7 Fletcher Cyc. Corp., Perm. Ed., §§ 3401, 3402. But Wilmington Provision Company accepted no money or other benefits from Goldman's unauthorized acts in its name. The factors loan was not made to the corporation by Heller and Company until Goldman had acquired control of it on March 12, 1948, and Sinskey had no part in this transaction. Furthermore, without determining whether the stockholders of Wilmington Provision Company had permitted Spiegel to exercise all corporate powers, as is claimed by the defendant, see Northern Assur. Co. v. Rachlin, 2 W. W. Harr. 406, 32 Del. 406, 125 A. 184, the contract of March 1, 1948, merely purported to authorize Goldman to hire persons in the regular course of the corporate business. Sinskey's employment was not of that nature. As Goldman was not president of the corporation until May 12, 1948, it is unnecessary to consider whether the bond executed by him in the corporate name on May 6, though dated May 7, and the confession of judgment under its provisions was within the implied powers of the president of a corporation. But see 3 Thompson on Corporations, 3d Ed., § 1596; Stokes v. New Jersey Pottery Co., 46 N.J.L. 327; Raub v. Blairstown Creamery Ass'n, 56 N.J.L. 262, 28 A. 384; Atlantic Refining Co. v. Ingalls & Co., 7 W. W. Harr. 503, 37 Del. 503, 185 A. 885.
Sinskey's judgment against Wilmington Provision Company is, therefore, void and should be so marked on the record in the office of the prothonotary for New Castle County. So far as the corporation is concerned, the bond on which judgment was confessed should also be marked void.
An order will be entered accordingly.