[No. 56204–1.  En Banc.  June 14, 1990.]

DONALD L. BARNETT, *Appellant,* v. JACK A. HICKS, ET AL, *Respondents.*

*Edwards, Sieh, Wiggins & Hathaway,* by *Charles K. Wiggins* and *Catherine Wright Smith,* for appellant.

*Rohan, Goldfarb, Breskin & Shapiro, P.S.,* by *Robert J. Rohan* and *David G. Knibb,* for respondents.

DOLLIVER, J.—In 1967 plaintiff and others incorporated Community Chapel and Bible Training Center (Community Chapel) under former RCW 24.08. In 1981, the articles of incorporation were amended under the Washington Nonprofit Corporation Act. RCW 24.03. According to the bylaws, prior to March 4, 1988, plaintiff was the "original Pastor", who was "recognized as the Spiritual Overseer of the Church, ordained and appointed of God for the ministry and to shepherd the flock of Community Chapel and Bible Training Center." The bylaws further provided that the original pastor, "having established the original Church by the direction of God and with support of the congregation, shall have oversight of same until the Pastor agrees to change."

The articles provided the corporation should exist without members and that the affairs of the church were to be managed by a board of senior elders, except as specifically restricted by the corporation bylaws. The board was to consist of at least three members, as well as plaintiff, who is designated as the original chairman and an ex officio member. The original chairman could not be removed while living. As long as plaintiff was pastor of the church and chairman, the board was not to meet without his presence or permission, except to consider his salary. The board had

no power to infringe upon the pastoral rights and authority listed in the bylaws.

For 20 years following its incorporation, Community Chapel apparently operated without untoward incident. In December 1987, however, allegations of sexual misconduct by plaintiff surfaced. In January 1988, the elders began a series of meetings and hearings regarding these allegations. In order to facilitate a fair hearing with respect to the allegations of sexual misconduct, plaintiff signed a written agreement in which he voluntarily stepped aside as pastor while the validity of these charges might be determined.

Hearings were conducted over several days in January and February 1988. On February 15, 1988, the elders wrote plaintiff proposing restrictions on his pastoral role and putting him on a "Special Status". Plaintiff refused to accept the special status and to honor the board's resolution of the problem. He announced to the congregation that he was not under the authority of the senior elders and would continue in his role as pastor.

On March 4, 1988, a board meeting was called and the senior elders met with plaintiff. The circumstances of the meeting are disputed. The elders claim they passed a resolution to amend the articles of incorporation in response to which plaintiff asked the elders to leave his residence. Plaintiff denies any vote was taken. He does, however, acknowledge that amendments to the articles had been placed on the table in front of him. In addition, he concedes the elders said they wanted to take a vote on some matter. However, plaintiff claims he asked the elders to leave before any further action was taken.

It is undisputed, however, that the elders continued the meeting at another site and that plaintiff did not join them. At the continuing meeting, the elders amended the articles by striking the provisions requiring the concurrence of plaintiff in any amendments to the articles and bylaws. They also voted to remove plaintiff as a senior elder, pursuant to the amended articles. In addition, the senior elders amended the bylaws to remove those provisions which gave

the original pastor the authority to veto actions of the board.

Plaintiff brought this action seeking a declaratory judgment that the senior elders had no authority to amend the articles without his concurrence. He also sought an order enjoining the elders from interfering with the performance of his duties on behalf of the church. The board counterclaimed for a declaration that it acted properly in amending the articles and bylaws. In its second counterclaim, the board alleged plaintiff had breached his fiduciary duty to the corporation, and because of that conduct the board had the right to remove him as a member of the board. Among other affirmative defenses to the elders' counterclaim, plaintiff asserted that voiding the church articles under the Washington Nonprofit Corporation Act would violate the free exercise clause of the First Amendment and Const. art. 1, § 11 (amend. 34).

The trial judge granted a partial summary judgment on the board's first counterclaim and struck down the concurrence requirement in the church's articles of incorporation as illegal. The court also held that plaintiff was legally removed as director and that the elders acted pursuant to a lawful board meeting:

It is undisputed here that (a) the bylaws do not provide any notice for regular or special directors meetings; (b) all four directors were present at Barnett's house on the morning of March 4, 1988; (c) there was no notice of an adjourned or recessed meeting to be resumed on 3/4/88 to the plaintiff; (d) Barnett at one point asked the other three directors to leave his house, which they did; . . . (f) there was a bylaw that stated that directors' meetings must either be permitted by Barnett or held in his presence; and (g) all directors were in Barnett's presence on the morning of March 4, 1988. The Court determines that there was a valid directors' meeting on the morning of March 4, 1988. This meeting was not terminated by Barnett's request that the other directors leave his house. This request reflected Barnett's clear choice not to participate in that meeting, either at that time or at any continuation of that meeting later that day. Based on the undisputed facts, and Barnett's own declaration, it is unbelievable to suggest that

Barnett intended to or evidenced an intent to participate further in the meeting on the morning of March 4, 1988, or any continuation of that meeting later that day.

The court did not address plaintiff's affirmative defenses. Later, in defendants' second motion for summary judgment, the court dismissed plaintiff's affirmative defenses and his complaint. The court granted the board judgment on its first counterclaim. Plaintiff appealed to the Court of Appeals. The appeal was then certified to this court.

The legal issues in this case are whether the pre–March 1988 articles of incorporation and bylaws of the Community Chapel on their face violated the Washington Nonprofit Corporation Act, RCW 24.03, and whether the board of senior elders/directors of Community Chapel has the authority to amend the articles of incorporation without the concurrence of the plaintiff. Neither of the parties has called to our attention any case holding that any corporation law in the country, profit or nonprofit, prohibits a provision in the articles of incorporation requiring the concurrence of a special individual to amend the articles. Without such authority defendants, to bolster their case, rely on vague claims of public policy and concern that there be no exaltation of "form over substance". We decline to adopt this analysis, however, but believe the language of the statutes themselves is controlling.

Article 6 of the articles of incorporation at issue reads as follows:

Amendments and Bylaws

Section 1: Amendments to these Articles of Incorporation may be made by a three–fourths (¾) affirmative vote of the Board of Senior Elders and the original Pastor's concurrence, if he is still presiding.

Section 2: The Bylaws shall be the governing law for the internal affairs of this corporation to the extent that they are not inconsistent with these Articles of Incorporation.

Section 3: The Bylaws of the corporation may be amended by a three–fourths (¾) affirmative vote of the Board of Senior Elders and the original Pastor's concurrence, if he is still presiding.

The defendants claim the right given by the articles of incorporation for one person to disapprove any amendment to the corporate articles was inconsistent with RCW 24.03-.115, which prohibits delegation of certain powers to committees of the board of directors, and with RCW 24.03.165(2), which allows a majority of the board of directors to amend the articles of incorporation.

■ The difficulty with the argument as to RCW 24.03-.115 is that the authority given plaintiff comes from the articles of incorporation, not from the board of directors. RCW 24.03.115 applies only to actions taken by a board of directors, not agreements reached in the articles of incorporation. While it is certainly true a veto power does reside in plaintiff, this fact is irrelevant. The statute forbids action by a *board of directors*; the case before the court involves language in the *articles of incorporation*. Nothing more than a prohibition against delegation to a committee of the board of directors is covered by the statute. The statute is silent on the issue of powers granted by the articles of incorporation. RCW 24.03.115 cannot and does not apply to this case.

RCW 24.03.165(2) provides for the amendment of articles of incorporation by a vote of the majority of the directors in office. However, RCW 24.03.455 provides:

> Whenever, with respect to any action to be taken by the members or directors of a corporation, the *articles of incorporation* require the vote or concurrence of a greater proportion of the members or directors, as the case may be, than required by this chapter with respect to such action, the provisions of the articles of incorporation shall control.

(Italics ours.)

It cannot be questioned but that on the face of article 6 of the articles of incorporation the "original Pastor" is necessary to any three–fourths majority which would amend either the bylaws or the articles of incorporation. Thus, the vote of the original pastor is that "vote or concurrence of a greater proportion" allowed by the statute.

The trial court stated:

> The requirement in Community Chapel's pre–March 4, 1988 articles for concurrence by the original pastor (Barnett) in any amendment to the articles violated on its face the prohibition against delegating the power to amend the articles. This required concurrence by the original pastor was an unlawful delegation to one person, and was not a "greater proportion" of directors as contemplated by RCW 24.03.165(2) and .455, because all directors did not have the same rights.

We disagree. The question to be examined is not what the statute "contemplates" but what it says. Nothing in the text of the act forbids the naming of the "original Pastor"—or anyone else—as the person who must be part of the three–fourths majority. Furthermore, we find no legislative history to justify twisting the meaning of the plain English of the statute. Article 6 might well, in retrospect, be viewed by some as an improvident provision. It is not the function of this court, however, to torture the statute in order to protect those who freely chose to enter into this kind of relationship.

The board of senior elders/directors of the Community Chapel has no authority, without the concurrence of plaintiff, to amend the articles of incorporation and bylaws. While we reverse the trial court and remand for further proceedings, we point out that this does not necessarily defeat the effort by the board to oust plaintiff. The issue of breach of fiduciary duty still remains to be considered by the trial court.

Reversed.

CALLOW, C.J., UTTER, BRACHTENBACH, ANDERSEN, and SMITH, JJ., and McINTURFF, J. Pro Tem., concur.

DORE, J.—I dissent. The Board of Directors of the Bible Training Center and Community Chapel[1] had authority to amend the articles of incorporation and bylaws and to terminate Pastor Barnett.

---

[1] For ease of reference Community Chapel and Bible Training Center will hereinafter be referred to as Community Chapel.

The majority eliminates the board's authority to protect the interests of the church and makes the board inoperative. The pastor's veto power over the actions of the board impermissibly allows one director to grind the wheels of the corporation to a halt. The Washington Nonprofit Corporation Act, RCW 24.03, protects the interests of a corporation and its directors by requiring a majority of the board or a "greater proportion" of the directors, as set forth in the articles of incorporation, to amend the articles and bylaws. Barnett's veto power violates the spirit and word of the Act. No majority could ever be attained, and no proportion would be great enough to amend the articles, if Barnett were not part of the vote.

Barnett, by entering into a written agreement whereby he agreed to step aside as pastor and permit the board of directors to have the exclusive right to conduct a hearing on his alleged sexual involvement with parishioners (which had resulted in lawsuits against the church) should be estopped from asserting his veto power.

The majority fails to set forth the written agreement between Barnett and the elders concerning the investigation of Barnett's alleged sexual misconduct. I believe that the agreement is an important element to deciding this case. The agreement signed by Barnett on January 25, 1988, reads as follows:

> The elders agree that it is necessary to protect Don from accusations of conflict of interest and of misusing his pastoral authority to exercise unfair control over these hearings to his personal advantage. Therefore, the elders ask Don to voluntarily submit to two conditions.
>
> 1. Don shall not exercise any authority over these hearings and over the exclusive eldership review sessions. The board of elders as a group shall exercise final authority over these meetings. This agreement applies only to these hearings and does not pertain to any other church matters.
>
> 2. Don & Jerry shall permit the hearings to continue until they are concluded to the satisfaction of the elders. Don shall not act as pastor to stop the meetings once they have begun.
>
> /s/ Donald Lee Barnett
> 1-25-88

Scott Hartley, a senior elder, later described the hearings and testimony in his affidavit of March 10, 1988:

The hearings began on January 25 and continued for five hours a day for the next several weeks. In attendance at the hearings, in addition to the Senior Elders, including Don Barnett, were 12 other ordained elders of the Church. For nine hours, Jerry Zwack detailed the facts of which he was aware relating to Don Barnett's sexual conduct and his abuse of pastoral authority.

. . . .

At the close of Zwack's presentation, Don Barnett responded for fifteen hours to the allegations and admitted twenty-seven adulterous acts with four different women over a period of sixteen months, but denied that any such acts had occurred as a result of his "spiritual conditions." He stated that some of these acts occurred at his home and some occurred when he took vacations with some of the women. He did not deny that he had threatened the women with disfellowshipping or that he had destroyed files.

As a result of his admissions, the senior elders decided that they did not need to hear from any other witnesses to verify Jerry Zwack's allegations, and decided that for the protection of Don Barnett and the Church, that Don Barnett should be placed on "Special Status," which would allow him to continue to occupy the position of Senior Pastor, but would prohibit his being alone with any females. This Special Status was announced to Don Barnett in a letter, a copy of which is attached. The decision to place Barnett on Special Status was announced to the church congregation on February 26, 1988, at the regular Friday night church service, and the congregation was requested to cooperate with this decision.

Clerk's Papers, at 26–27. Barnett, however, refused to accept special status and to honor the board's resolution of the problem. He announced to the congregation that he was not under the authority of the senior elders and that he would continue in his role as pastor.

INVALIDITY OF BARNETT'S VETO POWER UNDER THE
WASHINGTON NONPROFIT CORPORATION ACT

Church societies have exercised corporate rights from the earliest period of American law. In Washington state, a church may exercise corporate rights in at least three different ways. A church may incorporate as a "corporation sole", RCW 24.12.010, a nonprofit corporation managed by

a 1–person board or a nonprofit corporation managed by a board of two or more persons. RCW 24.03.100.[2] The "corporation sole" and the incorporated church managed by a 1–person board vest full management power in one individual. Full management power, however, does not lie exclusively in the hands of one person in an incorporated church managed by a board of two or more persons.

Community Chapel incorporated in 1967 with a 3–person board and Barnett was designated an ex officio member. Notwithstanding the opportunity to change to a 1–person board in 1986, Community Chapel retained the 3–person board. As a multimember board incorporated under the Act, Community Chapel must comply with the Act's provisions governing such corporations.

The Act prohibits the board from delegating the authority to amend articles or bylaws:

> If the articles of incorporation . . . so provide, the board of directors, . . . may designate and appoint one or more committees each of which shall consist of two or more directors, which committees, . . . shall have and exercise the authority of the board of directors in the management of the corporation: *Provided,* That no such committee shall have the authority of the board of directors in reference to amending, altering or repealing the bylaws; . . . amending the articles of incorporation; . . ..

RCW 24.03.115. Here, the articles gave Barnett the power to veto any amendments to the articles of incorporation. This unchallenged veto power has the unlawful effect of delegating power to amend the articles to less than the whole board. The final decision to amend the articles is delegated to one ex officio director. I agree with the trial court that the concurrence requirement violates the Act's prohibition against delegating power to amend the articles.

---

[2]The Act initially required a minimum of three directors for any corporation. Laws of 1967, ch. 235, § 21 (former RCW 24.03.100). In 1986, this requirement was changed to permit a 1–member board of directors. Laws of 1986, ch. 240, § 15. RCW 24.03.100.

The trial court also found the concurrence requirement was void under the "Greater voting requirements" provision of RCW 24.03.455. The Act requires that the corporation's articles shall be amended by a majority of the directors. RCW 24.03.165(2).[3] However, if the articles themselves so provide, the articles may be amended by a "greater proportion" of directors rather than a simple majority. RCW 24.03.455.[4]

The concurrence requirement does not provide for the vote of a "greater proportion" of directors to amend the articles. No proportion would be great enough to pass an amendment if Barnett were not part of it. The concurrence requirement is invalid under RCW 24.03.455 because it attempts to redefine the vote of the board in a way not permitted by the statute. *See Driver v. Driver*, 119 Wis. 2d 65, 73, 349 N.W.2d 97 (Ct. App. 1984). In addition, unlike the recently revised Model Nonprofit Corporation Act, there is nothing in the Washington Nonprofit Corporation Act to validate an article provision that requires a specified person to approve changes in the articles or bylaws. *See Revised Model Nonprofit Corporation Act,* Official Comment to § 10.30, at 278 (1987).[5]

---

[3]RCW 24.03.165 provides: "Amendments to the articles of incorporation shall be made in the following manner:

" . . . .

"(2) Where there are no members, or no members having voting rights, with regard to the question, an amendment shall be adopted at a meeting of the board of directors upon receiving the vote of a majority of the directors in office."

[4]RCW 24.03.455 provides in part: "Whenever, with respect to any action to be taken by the members or directors of a corporation, the articles of incorporation require the vote or concurrence of a greater proportion of the members or directors, as the case may be, than required by this chapter with respect to such action, the provisions of the articles of incorporation shall control."

[5]Section 10.30 of the Revised Model Nonprofit Corporation Act provides: "The articles may require an amendment to the articles or bylaws to be approved in writing by a specified person or persons other than the board. Such an article provision may only be amended with the approval in writing of such person or persons." *Revised Model Nonprofit Corporation Act* 277 (1987). This section is new and is not based on any prior law.

The Legislature with its "greater proportion" language allows power to be equally shared among more directors; it does not allow concentration of power in one ex officio director. A "greater proportion" is *not* one person with the veto power to grind the wheels of the corporation to a halt. If a corporation wants a director to have unilateral control, it must incorporate as a 1–person board. This was not done here.

This rule makes sense, particularly when viewed against the potential liability individual directors are subject to for mismanagement of corporate affairs. Directors have a duty to perform "in a manner such director believes to be in the best interests of the corporation". RCW 24.03.127. If a director breaches this duty he may be liable. If a director may be liable for actions not taken in the best interests of the corporation, he must at least have the corresponding power to deal with those actions in order to protect himself. The directors here were concerned about pending lawsuits against the corporation by three former members of the congregation who alleged damages as a result of Barnett's sexual behavior. The board sought to protect the church from lawsuits and the directors from individual liability by putting Barnett on special status, meaning he was not to be alone with any females. Barnett, with his veto power, if valid, could prevent the board from protecting the interests of the church and could make the board inoperative. In such a situation, the board would have been powerless to prevent the pastor from being alone with female members of the church.

In sum, I would hold that the concurrence requirement is invalid under the Act because it unlawfully delegates power to amend the articles to one individual and it establishes voting requirements in the articles that are not provided for in the Act. The senior elders had the authority to amend the articles without Barnett's concurrence.

FREE EXERCISE OF RELIGION NOT PROHIBITED

Barnett contends if the concurrence requirement in Community Chapel's articles of incorporation violates the Act, voidance of the articles under the Act unconstitutionally impairs his free exercise of religion under the First Amendment.[6] Barnett argues that he is entitled to greater protection under the Washington Constitution.[7] He relies on the textual language of the state constitution. However, this court has noted that textual distinctiveness alone is insufficient justification for reliance on the state constitution as an independent ground for decision. *State v. Jones,* 112 Wn.2d 488, 498 n.11, 772 P.2d 496 (1989). Therefore, his claims will be analyzed under the federal provision only.

The free exercise clause of the First Amendment provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .". U.S. Const. amend. 1. The critical word in the free exercise clause is "prohibit". *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 99 L. Ed. 2d 534, 108 S. Ct. 1319, 1329 (1988).

In addition to outright prohibitions, the Supreme Court has repeatedly held that indirect coercion or penalties on

---

[6]Barnett attempts to argue the trial court's ruling violates the establishment clause of the First Amendment as well. This argument was not raised before the trial court. While Barnett suggests that his reliance on the full text of the First Amendment implicitly included the establishment clause, he did not argue nor furnish authority on this issue before the trial court. A constitutional issue not raised in the trial court will not be considered by an appellate court, *In re Rosier,* 105 Wn.2d 606, 616, 717 P.2d 1353 (1986), nor does RAP 2.5(a)(3) save the establishment clause issue for review by this court. RAP 2.5(a)(3) contemplates an exception for a *trial error* affecting a constitutional right. *State v. Scott,* 110 Wn.2d 682, 686, 757 P.2d 492 (1988). It may not be invoked because a party can "'identify a constitutional issue not litigated below.'" *Scott,* at 687 (quoting *State v. Valladares,* 31 Wn. App. 63, 76, 639 P.2d 813 (1982), *aff'd in part, rev'd in part,* 99 Wn.2d 663, 664 P.2d 508 (1983)).

[7]Article 1, section 11 of the Washington Constitution provides that "[a]bsolute freedom of conscience in all matters of religious . . . worship . . . shall be guaranteed to every individual . . .". Const. art. 1, § 11 (amend. 34).

the free exercise of religion are subject to scrutiny under the First Amendment.[8] However, "a mere denial of a governmental benefit by a uniformly applicable statute does not constitute infringement of religious liberty." *Bowen v. Roy,* 476 U.S. 693, 704, 90 L. Ed. 2d 735, 106 S. Ct. 2147 (1986); *see Lyng,* 485 U.S. at 450–55.

In *Lyng,* Indian organizations challenged the Forest Service's plan to permit timber harvesting and road construction in an area that was traditionally used for religious purposes by members of three American Indian tribes in northwestern California. The Court acknowledged that the government's action will virtually destroy the Indians' ability to practice their religion. Nonetheless, the Court held the free exercise clause did not prohibit the government from pursuing its plan of timber harvesting and road construction because the plan neither coerces conduct inconsistent with religious beliefs nor penalizes religious activity. The Court distinguished the indirect coercion cases from the facts before it and held that these cases did not imply that:

> incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, [does not] require government to bring forward a compelling justification for its otherwise lawful actions.

*Lyng,* 485 U.S. at 450–51.

Like *Lyng,* this case is dissimilar to those in which persons have been pressured to choose between rights and practicing their religion. *See Wisconsin v. Yoder,* 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972); *Sherbert v.*

---

[8]*See Wisconsin v. Yoder,* 406 U.S. 205, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) (compulsory school attendance law); *Sherbert v. Verner,* 374 U.S. 398, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963) (denial of unemployment benefits to applicant who refused to accept work requiring her to violate the Sabbath); *Thomas v. Review Bd. of Ind. Empl. Sec. Div.,* 450 U.S. 707, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981) (denial of unemployment benefits to applicant whose religion forbade him to fabricate weapons); *Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 94 L. Ed. 2d 190, 107 S. Ct. 1046 (1987) (denial of unemployment benefits to religious convert who resigned position that required her to work on the Sabbath).

*Verner,* 374 U.S. 398, 406, 10 L. Ed. 2d 965, 83 S. Ct. 1790 (1963). The dilemma presented to individuals in the coercion cases, *Yoder* and *Sherbert,* was absolute. Individuals were forced to choose between neglecting their religious obligations and rendering themselves liable for criminal sanctions or ineligible for state benefits.

The law at issue here does not involve government compulsion. The Act is wholly neutral in religious terms and uniformly applicable to incorporators under the Act. Furthermore, the Act does not require churches to incorporate. Only when a church voluntarily seeks incorporation, as was done in the subject case, is it constrained by the Act. However, the Act itself permits unilateral control of a church if it is incorporated with a 1–person board.

Barnett had the choice and opportunity of unilateral control over his church by incorporating with a 1–person board. He declined to do this. Barnett, by his action, failed to avail himself of the statutory provisions which would accomplish the very thing he wants done here. The Act did not affirmatively compel Barnett, by threat of sanctions or loss of benefits, to refrain from religiously motivated conduct. It simply regulates a secular activity. Furthermore, no tenet of Barnett's religion demands that he incorporate under the Act. Barnett has not carried his burden of showing that his religious practice is burdened by the Washington Nonprofit Corporation Act.

### BARNETT SIGNED AGREEMENT WITH ELDERS TO STEP ASIDE AS PASTOR AND TO NOT PARTICIPATE IN PROCEEDINGS

Barnett agreed to step aside as pastor and authorized the board of directors to conduct hearings to resolve a solution. Barnett is now estopped from asserting any claimed right of concurrence at the subject meetings. In order to establish equitable estoppel, it must be shown that the party to be estopped (1) made an admission, statement or act which was inconsistent with his later claim; (2) that the other party relied thereon; and (3) that the other party would

suffer injury if the party to be estopped were allowed to repudiate his earlier admission, statement or act. *Board of Regents of UW v. Seattle,* 108 Wn.2d 545, 551, 741 P.2d 11 (1987).

Here, Barnett voluntarily signed an agreement to facilitate fair hearings about his alleged sexual misconduct. Clerk's Papers, at 35. He agreed that the board of directors "shall exercise final authority over these meetings" and he forfeited his right to act as pastor to stop the meetings once they had begun. By the agreement, Barnett implicitly authorized the board to adopt a resolution of this matter. The board conducted a series of hearings which lasted for 5 hours a day for several weeks. At the conclusion of these hearings, the board adopted a resolution which Barnett rejected because he apparently didn't like it. The meeting on March 4, 1988, was a direct consequence of Barnett's rejection of the board's resolution. Barnett, by the agreement, induced the board to devote its time and energies to carry out the terms of the agreement. The board acted on such representations and would be greatly prejudiced if Barnett could repudiate his commitment. As a result of Barnett's signing the agreement and the board's justifiable reliance upon his action, Barnett should be estopped from withdrawing from his obligation under the agreement.

## NOTIFICATION

Barnett contends that, even if the concurrence requirement was invalid under the Act and his exercise of religion was not violated, he was not properly notified of the board's afternoon meeting on March 4, 1988. Barnett argues that the actions of the board at the March 4 meeting were invalid because the elders never gave notice to Barnett that they continued the meeting.

The Act requires notification of meetings only if the bylaws or articles require such notice. RCW 24.03.120. The articles and bylaws of Community Chapel did not require notice of meetings. Therefore, it is irrelevant whether the elders failed to give adequate notice of their intention to

continue the morning meeting of March 4, 1988. Furthermore Barnett waived his claimed veto power and his right to be present at the subject meetings.

A waiver arises by the intentional and voluntary relinquishment of a known right, or by a neglect to insist upon it. *Bowman v. Webster,* 44 Wn.2d 667, 669–70, 269 P.2d 960 (1954). In addition, an implied waiver may arise by a person's course of conduct. After a party has waived a right he may not reclaim it without the consent of his adversary. *Bowman,* at 670. The determination of waiver is a question for the trier of fact. *Bowman,* at 670.

The trial court found Barnett waived any rights he may have had to be present at the subject meetings by his conduct on the morning of March 4, 1988:

all directors were in Barnett's presence on the morning of March 4, 1988. The Court determines that there was a valid directors' meeting on the morning of March 4, 1988. This meeting was not terminated by Barnett's request that the other directors leave his house. This request reflected Barnett's clear choice not to participate in that meeting, either at that time or at any continuation of that meeting later that day. Based on the undisputed facts, and Barnett's own declaration, it is unbelievable to suggest that Barnett intended to or evidenced an intent to participate further in the meeting on the morning of March 4, 1988, or any continuation of that meeting later that day.

Clerk's Papers, at 654–55.

No one disputes that a valid meeting was under way when Barnett grew angry with the other directors and ordered them out of his house. By this conduct, he effectively walked out of the meeting and waived his right to be present and participate at that meeting or any continuation of it. Consequently, Barnett's absence does not render the subsequent proceedings illegal. *See Robinson v. Davis,* 126 A.D.2d 715, 511 N.Y.S.2d 311 (1987).

## CONCLUSION

Barnett was justifiably terminated from his pastorate for the following reasons:

(1) Community Chapel's board of directors had the statutory authority to amend the church's articles of incorporation and bylaws negating Barnett's veto power pursuant to the Act. The concurrence requirement unlawfully delegated authority to one person (Barnett) to amend the articles and bylaws. It further established voting requirements in the articles prohibited by the Act.

(2) Barnett, by entering into a written agreement whereby he agreed to step aside as pastor and permit the board of directors to have the exclusive right to conduct a hearing on his alleged sexual involvement with parishioners and to make findings and effectuate a resolution, waived his right to protest and withdraw from the agreement. He should be estopped from withdrawing his obligation under the agreement.

(3) The senior elders acted pursuant to a valid directors meeting. At the meeting of March 4, 1988, Barnett did not exercise his claimed veto power, instead, he ordered the elders to leave his home. He failed to go with them to the new meeting site to conclude the board's business. By his actions, he waived any and all rights he might have had to be present at the meeting.

I would affirm the trial court.

DURHAM, J., concurs with DORE, J.