[No. 22125-0-II. Division Two. April 30, 1999.]

HARTSTENE POINT MAINTENANCE ASSOCIATION, *Respondent*, v. JOHN E. DIEHL, *Appellant*.

---

*John E. Diehl*, pro se.

*Burgess Fitzer Leighton & Phillips, P.S.*, by *Robert W. Novasky* and *Maureen M. Falecki*, for respondent.

ARMSTRONG, J. — John Diehl appeals a judgment that he violated the restrictive covenants of Hartstene Point when

he cut down a tree on his property. Because the architectural control committee was not properly constituted when it denied Diehl's tree cutting application, we reverse the judgment in part.

## FACTS

Hartstene Pointe is a 530-lot community formed by a subsidiary of the Weyerhaeuser Corporation on Hartstene Island in Mason County. Lots in the community are subject to restrictive "Covenants, Conditions, and Restrictions" (CC&Rs), whose purpose is "to protect the value and desirability of the aforesaid real property." These covenants are enforced by an Architectural Control Committee (ACC), appointed by the Hartstene Point Maintenance Association's Board of Directors (HPMA).

Article VI of the CC&Rs governs "Architectural Controls," and provides, in relevant part:

> No landscaping work, including the removal of natural trees, shrubs, brush, and other ground cover, shall be undertaken on any Platted Residential Lot until the plans and specifications showing the nature and other details of the proposed work shall have been submitted to and approved in writing by the Board of Directors of the Association or by the aforementioned architectural control committee appointed by the Board.

In May 1992, John Diehl, owner of lot 92 in Hartstene Pointe, submitted an application to remove trees from his property in order to construct a residence. Diehl proposed cutting over 30 trees. Diehl's application was approved on condition that he not cut a single 26-inch diameter cedar located approximately 15 feet from the south side of his proposed home. The tree was located in the middle of an area where Diehl proposed to build a "Japanese-style garden." Diehl appealed the ACC decision to the Board of Trustees, which eventually denied it.

Nevertheless, Diehl removed the tree. No further action was taken until a separate dispute over road maintenance arose approximately one year later. In December 1993, the

new chairman of the ACC notified Diehl that a fine of $1,000 had been levied against Diehl for cutting the tree, as well as other fines relating to other disputed matters that are not the subject of this appeal. Diehl appealed the fines to the Board, which denied his appeal. The Board also imposed other sanctions, including the loss of his voting privileges in the HPMA.

In May 1994, the HPMA sued to abate alleged violations of several covenants; the HPMA also sought a monetary judgment and suspension of voting rights and use-privileges for HPMA common areas and facilities. Following a six-day trial, the trial court invalidated fines against Diehl in the amount of $4,500, finding that the HPMA documents did not authorize the Board or the ACC to impose fines. But the court did find that Diehl "violated the laws of Hartstene Pointe when he cut the 26″ cedar tree . . . ." The trial court concluded that "[b]ecause defendant violated the laws of Hartstene Point, he is subject to the penalties contained within those laws." The trial court ruled in favor of Diehl on several other issues, not the subject of this appeal, and thus ruled that neither party was entitled to attorney's fees.

Diehl raises a number of challenges to the Board's action, including that the ACC was not properly constituted under the governing documents for the community. Because our decision on this issue is dispositive, we do not address Diehl's other arguments.

## ANALYSIS

### ACC Composition

■ Diehl contends that the ACC was not properly composed at the time it denied his tree-cutting application, and therefore the denial was improper. Diehl claims that the ACC did not meet the requirements of either the CC&Rs or of RCW 24.03.115. Article VI of the CC&Rs states that appropriate applications "shall have been submitted to and approved in writing . . . by the Board of

Directors of the Association, or by an architectural control committee composed of three members appointed by the Board." Further, RCW 24.03.115, which governs nonprofit corporations and associations in Washington, provides in relevant part:

> If the articles of incorporation or the bylaws so provide, the board of directors, by resolution adopted by a majority of the directors in office, may designate and appoint one or more committees each of which shall consist of two or more directors, which committees, to the extent provided in such resolution, in the articles of incorporation or in the bylaws of the corporation, shall have and exercise the authority of the board of directors in the management of the corporation . . . .

RCW 24.03.115.

The HPMA does not dispute that the ACC consisted of five members of the HPMA, only one of whom was a member of the Board of Directors. But the HPMA argues that the CC&Rs language does not *limit* the members of the ACC. This argument contradicts the plain language of the CC&Rs and the statute. The CC&Rs authorize an architectural committee of three members, not three or more. And under the HPMA's reasoning, there would be no limit on the number of committee members, either more or less than three. This would render the language of the CC&Rs meaningless. Further, the argument ignores the statutory mandate that such committees consist of two or more directors. Thus, even if the CC&Rs are read to allow more than three members, the makeup of the ACC here was flawed because it contained only one board member.

And the HPMA does not deny that it is a nonprofit corporation governed by RCW 24.03.115. Rather, the HPMA argues that a Washington nonprofit corporation may deviate from the RCW requirements by amending its founding documents, citing *Barnett v. Hicks*, 114 Wn.2d 879, 792 P.2d 150 (1990).

But nothing in the record shows that the "founding documents" have been amended. The only copy of the articles

of incorporation in the record does not mention the ACC. And the only copy of the bylaws in the record explicitly provides that the directors have the power to appoint an ACC *"consisting of two or more directors,* and to delegate to the said Committee authority to interpret, administer, and enforce the covenants." Further, article IX of the bylaws states that "The Board of Directors shall appoint an Architectural Control Committee . . . as hereinbefore provided." No other "founding documents" are before this court.

Moreover, *Barnett* did not hold that nonprofit corporations may alter statutory requirements by amending their founding documents. The issue in *Barnett* was whether Washington statutes and the articles of incorporation permitted a nonboard member to exercise veto power over board actions. The court held that RCW 24.03.115 did not apply to the question. *Barnett,* 114 Wn.2d at 884. *Barnett* did not address the issue of whether nonprofit corporations could alter the statutory requirements concerning committee composition.

█ Finally, although it did not advance the argument before the trial court, the HPMA now contends that Diehl cannot challenge the composition of the ACC because of RCW 24.03.040, which limits the use of ultra vires.

That statute provides:

No act of a corporation and no conveyance or transfer of real or personal property to or by a corporation shall be invalid by reason of the fact that the corporation was without capacity or power to do such act or to make or receive such conveyance or transfer, but such lack of capacity or power may be asserted

. . . .

RCW 24.03.040. None of the exceptions apply.

The phrase "ultra vires" describes corporate transactions that are outside the purposes for which a corporation was formed and, thus, beyond the power granted the corporation by the Legislature. *Twisp Mining & Smelting Co. v. Chelan Mining Co.,* 16 Wn.2d 264, 293-94, 133 P.2d 300 (1943).

But Diehl does not contend that the HPMA lacked authority to regulate the architectural development of the community. Rather, he argues only that the way in which such control was exercised in his case did not conform with the governing documents of the corporation. This is not a challenge to the authority of the corporation, but only to the method of exercising it. And to hold that such a challenge is barred by ultra vires would be to hold the regularly adopted corporate procedures a nullity. If, as HPMA suggests, RCW 24.03.040 prevents Diehl's challenge, the corporation would be free to disregard its own bylaws that prescribe the makeup of committees. In short, the corporate articles and bylaws would be largely meaningless.

Our conclusion is supported by *Twisp*, 16 Wn.2d at 293-94. There, the articles of incorporation provided for a seven-member board of directors. An ultra vires challenge was made to a transfer of corporate property authorized by three board members. The court held the transfer was not ultra vires because the *corporation* had authority to transfer the property. *Id*. Rather, the transfer was subject to challenge only if it resulted from a "failure to observe in its execution a requirement of law enacted for the benefit or protection of a certain class . . . ." *Id*. at 294. As such the action was not void as ultra vires, but only voidable if successfully challenged. *Id*. Similarly, here Diehl does not challenge the corporate authority to regulate lot development in Hartstene, but only the manner of executing such authority, i.e., by an irregularly constituted committee. Thus, the doctrine of ultra vires does not apply to Diehl's claim. And because the ACC was improperly composed under both the Washington statute and the HPMA's charter, the ACC's conditional denial of Diehl's application was invalid.

Attorney's Fees

HPMA asks for attorney's fees. Because the HPMA is

not the prevailing party on appeal, we deny the request. Diehl, who is pro se, has not asked for attorney's fees.

## CONCLUSION

We reverse that portion of the judgment finding that Diehl violated the laws of Hartstene Point by cutting the 26-inch diameter cedar tree. We remand for entry of findings and conclusions consistent with this opinion.

MORGAN and SEINFELD, JJ., concur.