**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| PAUL BRAIN, | No. 57716-0-II |
| Appellant, | |
| v. | |
| CANTERWOOD HOMEOWNERS ASSOCIATION, | UNPUBLISHED OPINION |
| Defendants. | |

GLASGOW, C.J.— Paul Brain and his wife, Vanessa Herzog, co-owned a house and were members of the Canterwood Homeowners Association in Gig Harbor. Canterwood's governing documents provided that if the election of association board members was to occur by ballot, the owners had to receive notice and a ballot. Each lot or dwelling unit was permitted a total of one vote in association board elections, even if multiple people owned the lot or dwelling unit. In 2020 and 2021, Canterwood conducted board elections by mailing one envelope to each lot or unit addressed to all owners and containing a notice of the annual members' meeting and election, as well as a single ballot.

Brain sued, seeking a declaratory judgment that the 2020 and 2021 elections and any subsequent board actions were void because each individual owner did not receive a separate notice and ballot. In his case, the association did not provide separate notices and ballots to both Brain and Herzog.

Brain and Canterwood each sought summary judgment on the question of whether the notice and voting materials complied with the relevant statutes governing the homeowners' association elections and Canterwood's governing documents. The trial court concluded that the association minimally complied with the relevant statutes and governing documents and denied Brain's motion. The court granted Canterwood's motion for summary judgment and dismissed the lawsuit.

Brain appeals. Relying in part on the statute establishing requirements for government elections, Brain argues that mailing a single notice and ballot to a residence owned by multiple people violated the statutes controlling the homeowners' association elections and Canterwood's governing documents. Canterwood seeks attorney fees on appeal.

The statutes addressing government elections do not apply, and the trial court correctly concluded that Canterwood achieved compliance with the relevant statutes and Canterwood's governing documents. We affirm. We also award Canterwood attorney fees on appeal in an amount to be determined by a commissioner of this court.

FACTS

I. BACKGROUND

Brain and his wife owned a home in the Canterwood development, making them members of the community's homeowners' association. The community contains approximately 750 lots.

Canterwood was incorporated under the Washington Nonprofit Corporation Act, former chapter 24.03 RCW (1980). Canterwood's governing documents were articles of incorporation; bylaws; and a declaration of covenants, conditions, and restrictions (CCRs). Owning a lot or dwelling unit was the sole qualification for membership in Canterwood's homeowners'

association. Canterwood was managed by a board of directors elected on staggered three-year terms. It held annual elections for the director positions.

Canterwood could conduct the annual board election at the annual meeting where members could vote in person or by proxy, or Canterwood could conduct the election separate from the meeting. RCW 64.38.120(6). The election of board members was "by secret written ballot." Clerk's Papers (CP) at 155. Each lot or dwelling unit in the community had one vote in the director elections and other voting matters. Article IV, section 4.2 of the CCRs provided, "When more than one person holds an interest in any dwelling unit, all such persons shall be members. The vote for such dwelling unit *shall be divisible* and exercised as the owners determine, but in no event shall more than one vote be cast with respect to any dwelling unit." CP at 120 (emphasis added); *see* CP at 147 (identical provision in articles of incorporation using "lot" instead of "dwelling unit").

Canterwood held annual meetings of the members in December of each year. For any action taken at a meeting to be valid, a quorum of "members or proxies entitled to cast one-tenth (1/10th) of the votes" had to be present at the meeting. CP at 154. This meant that approximately 75 lots had to be represented by members or proxies at the meeting. Canterwood also conducted board elections via ballot every December. The bylaws stated that Canterwood would mail notice of the annual meeting and election "to each member entitled to vote thereat, addressed to the member's address last appearing on the books of the Association, or supplied by such member to the Association for the purpose of notice." CP at 153.

The Canterwood board elections were different from government elections. A person could vote by proxy in a board election, a person could vote more than once if they owned more than one lot or dwelling unit, and multiple owners of a single lot were entitled to only one vote.

Canterwood's governing documents provided that "[t]he persons receiving the largest number of votes shall be elected." CP at 155.

Before 2020, members could either mail in their ballot, drop it off at the association's office, or drop it off at the annual meeting. In 2020 and 2021, Canterwood mailed a single envelope to each lot or dwelling unit unless a member had provided an alternate address. Each envelope contained "the annual meeting information, a ballot, a proxy[,] and other relevant information." CP at 187. The envelope was addressed collectively to all lot owners--for example, the envelope sent to Brain and Herzog's house was addressed to "PAUL & VANESSA BRAIN/HERZOG." CP at 187. Each envelope contained a single meeting notice and ballot, regardless of the number of owners of the lot.

Nothing in the meeting notice or ballot was unique or directed at a specific member. The meeting notices informed members that the annual meetings would be held remotely due to the COVID-19 pandemic. The notices stated that the board election and other votes would be conducted via a ballot enclosed in the same envelope. The notice also stated that attendance at the meeting was "*not required to have your vote counted*, but the quorum [would] be determined by proxies and attendees at the Zoom meeting." CP at 53, 66.

Of the roughly 750 lots in Canterwood, 165 members either attended the 2021 meeting or were represented by proxies, and 221 votes were cast.

## II. DISPUTE ABOUT FRACTIONAL VOTING AND LAWSUIT

Brain ran for a board position in 2020 and was elected. He resigned before the 2021 election. Brain was not on the ballot for a director position in the 2021 election.

The day before the annual meeting in December 2021, Herzog asked Canterwood's management company about the right to fractional voting in Canterwood's governing documents. A community manager responded that the documents "indicate that multiple owners of the same lot have the ability to split their vote if they wish," although no Canterwood member had ever requested to do so. CP at 60. She explained, "If you wish to proceed with splitting your one vote, you would need to indicate that in writing to the Association Secretary in advance of your ballot being submitted." *Id.* Another management company employee also stated, "Should someone request [to split their vote], I believe the Association would certainly accommodate them." CP at 58.

There is no evidence in our record that Brain requested to split his and Herzog's vote or that he was refused the ability to do so for the 2021 board election. The management company elaborated in a later e-mail that the parties were "on the same page" because "[w]e all agree they have a right to vote fractionally. . . . Should someone request to do so[,] [t]hey can." CP at 57.

Brain then sued Canterwood, seeking a declaratory judgment that Canterwood's election procedures violated article IV, section 4.2 of the CCRs and RCW 64.38.120, which sets voting requirements for homeowners' associations. Brain sought a judgment "as to whether the election of any current Board member is void as a result, whether the current Board . . . has any authority to act on behalf the [association,] and/or whether any actions taken by the Board since the last election are void." CP at 333. Brain did not assert in his complaint that Canterwood ever denied any request to cast a fractional vote or that any ballot he cast had been rejected and not counted.

Brain moved for summary judgment, arguing there was no dispute of material fact. He asked the trial court to declare "that the 2020 and 2021 elections were invalid," as well as any

5

actions by the directors elected in those elections. CP at 8. Canterwood agreed that there were no genuine issues of material fact and asked the trial court to grant summary judgment in Canterwood's favor and dismiss Brain's lawsuit. Canterwood contended that because its board elections occurred at the same time as the annual meeting, the statutory provisions addressing elections at meetings controlled. Canterwood also departed from its prior position and asserted that its governing documents did not give multiple owners of a single lot or dwelling unit a right to cast a fractional vote. Instead, it contended that if a lot or dwelling unit had multiple owners, "a majority of the owners of the lot decide how [the lot's] one vote is cast." CP at 99. When a ballot was returned, Canterwood checked the signature on the envelope against the roster of lot owners, and once a lot owner voted, no other ballots returned for that lot would be counted.

The trial court first concluded that, because ballots were mailed in, instead of being cast at the annual meeting, the provisions of chapter 64.38 RCW addressing voting by ballot controlled, not other statutory provisions about voting *at* an annual meeting. And the trial court determined that Canterwood was bound to its initial position that the governing documents permitted fractional voting. Nevertheless, the trial court concluded that Canterwood's notice and ballots met the requirements in the statutes and governing documents. The trial court denied Brain's motion for summary judgment and granted Canterwood's, dismissing the lawsuit.

Brain timely moved for reconsideration, which the trial court denied. Brain appeals.

ANALYSIS

SUMMARY JUDGMENT

Brain argues that the trial court erred by denying his motion for summary judgment, granting Canterwood's, and denying his motion for reconsideration. He reasons that the trial court

6

erred when it concluded that Canterwood minimally complied with the notice requirements for association board elections. He insists that the single notice and ballot mailed to his house with both his and Herzog's names on the envelope did not meet the notice requirements of RCW 64.38.120(6). He also argues that we should rely on a definition of the term "ballot" from chapter 29A.04 RCW, regarding government elections and the governing documents' threshold for establishing a quorum to conclude that Canterwood was required to send a separate notice and ballot to each individual owner. Appellant's Opening Br. at 13-16. Thus, he contends that we should reverse the trial court's grant of summary judgment and remand for further proceedings.

Canterwood responds that the notice and ballot it sent complied with its governing documents and the statutory requirements. On appeal, it insists again that its governing documents do not require it to permit fractional voting. Canterwood also continues to assert that, because there was an annual meeting, the statutory provisions regarding voting at a meeting, as opposed to voting that is separate from a meeting, control. Additionally, it emphasizes the statutory provision that an ineffective good faith attempt to deliver notice does not invalidate subsequent board action. *See* former RCW 64.38.110(5) (2021).

We review both summary judgment orders and questions of statutory interpretation de novo. *Kunath v. City of Seattle*, 10 Wn. App. 2d 205, 217, 444 P.3d 1235 (2019). Summary judgment is appropriate where the pleadings and record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We must "view the evidence and apply all reasonable inferences in the light most favorable to the nonmoving party." *Antio, LLC v. Dep't of Revenue*, 26 Wn. App. 2d 129, 134, 527 P.3d 164 (2023). "There is a genuine issue of material fact only if reasonable minds could disagree on the conclusion

of a factual issue." *Id*. "However, if the material facts are not in dispute, summary judgment can be determined as a matter of law." *Id*.

A.      Relevant Statutes Versus Statutes That Do Not Apply

The parties continue to dispute which statutory provisions apply to Canterwood's elections. They also dispute whether we should use the definition of "ballot" from Title 29 RCW, which controls government elections for public office.

We can discern a statute's plain meaning "from the language of the statute itself, other provisions of the same act, and related statutes." *Kunath*, 10 Wn. App. 2d at 217. "Terms in a statute are read with their common and ordinary meaning, absent ambiguity or a statutory definition. A dictionary can supply an undefined term's ordinary meaning." *Id*.

1.      Which statutory ballot and notice requirements apply

Brain argues in part that we should apply language in chapter 24.06 RCW, the Nonprofit Miscellaneous and Mutual Corporations Act. But Canterwood was incorporated under the Washington Nonprofit Corporation Act, former chapter 24.03 RCW, which the legislature repealed and replaced with chapter 24.03A RCW *after* the 2021 board election. *See* LAWS OF 2021, ch. 176 (effective date January 1, 2022). Thus, chapter 24.06 RCW does not apply. We will instead apply the standards in former chapter 24.03 RCW and the chapter that governs homeowners' associations, chapter 64.38 RCW.

The parties also dispute which provisions of chapter 64.38 RCW apply. We first note that the legislature enacted the relevant notice and ballot requirements in RCW 64.38.120 in 2021, so those provisions apply to only the 2021 board election. LAWS OF 2021, ch. 227, §12 (effective date July 25, 2021). They cannot be a basis for invalidating the 2020 board election.

Next, the notice and ballot requirements for a homeowners' association election depend on whether voting occurs at a meeting. When voting happens at a meeting, RCW 64.38.120(3) controls, allowing "[o]wners or their proxies who are present in person" to vote by "any . . . method." However, an association can hold an election without holding a meeting if the voting is by ballot. RCW 64.38.120(2). To do so, "[t]he association must notify the owners that the vote will be taken by ballot." RCW 64.38.120(6)(a). Here, although Canterwood held a members' meeting in 2021, members mailed in their ballots and their presence at the meeting in person or by proxy was not required to have their vote counted. Thus, we agree with the trial court that RCW 64.38.120(6) controls.

2.      Requirements imposed by former RCW 24.03 and RCW 64.38

Canterwood had to meet certain requirements when providing notice for the annual meeting. Former RCW 24.03.080(1) (2004) addressed notice of meetings for nonprofit corporations in general, providing that written notice of a meeting had to be "delivered . . . to each member entitled to vote at such meeting." For homeowners' associations specifically, RCW 64.38.035(2) requires notice of a meeting "to be provided to each owner."

With regard to requirements for elections, former chapter 24.03 RCW did not set any specific requirements but generally provided, "The right of the members, or any class or classes of members, to vote may be limited, enlarged or denied to the extent specified in the articles of incorporation or the bylaws." Former RCW 24.03.085(1) (2004).

Under RCW 64.38.120(6), a homeowners' association must notify members in writing that a vote will be conducted by ballot, and the notice "shall be provided to the recipient" by personal delivery, mail, or "electronic transmission." Former RCW 64.38.110(1) (2021). "Notice to a lot

9

owner or occupant shall be addressed to the lot address unless the owner has requested . . . that notices be sent to an alternate address." Former RCW 64.38.110(2)(b). "The ineffectiveness of a good faith effort to deliver notice by an authorized means does not invalidate action taken at or without a meeting." Former RCW 64.38.110(5). Further, "[t]he association must deliver a ballot to every owner with the notice." RCW 64.38.120(6)(c). "The ballot must set forth each proposed action and provide an opportunity to vote for or against the action." RCW 64.38.120(6)(d). "Approval by ballot . . . is valid only if the number of votes cast by ballot equals or exceeds the quorum required to be present at a meeting authorizing the action." RCW 64.38.120(6)(f).

      3.      Definition of "ballot"

Canterwood's governing documents stated each lot or dwelling unit received a single vote in elections, and if multiple people co-owned a property, "all such persons shall be members" and "[t]he vote for such dwelling unit shall be divisible and exercised as the owners determine, but in no event shall more than one vote be cast with respect to any dwelling unit." CP at 120.

Brain asks us to rely on a definition of "ballot" in RCW 29A.04.008, which relates to government elections for public office, for example, to conclude that multiple voters were prohibited from using a single ballot. He argues that interpreting "ballot" to encompass the possibility of multiple people casting a single vote in a homeowners' association election "is simply beyond the pale of common understanding of the term." Appellant's Opening Br. at 13. We disagree.

Chapter 29A.04 RCW's definitions of "ballot," include "[a] physical or electronic record of the choices of an *individual* voter in a particular primary, general election, or special election." RCW 29A.04.008(1)(c) (emphasis added). But we distinguish between government elections for

public office and homeowners' association board elections. While ballots in government elections are secret, voting systems in those elections are designed and tested to avoid accidental double-counting. RCW 29A.04.206; RCW 29A.12.080. The unit of voting in a government election is the individual due to the "one-person, one-vote principle." *Eugster v. State*, 171 Wn.2d 839, 843, 259 P.3d 146 (2011). One person cannot cast more than one ballot in a government election, it is not possible to vote via proxy, and multiple people cannot share a single vote. RCW 29A.52.161; *see* RCW 29A.92.020.

In contrast, the unit of voting in a Canterwood board election was the lot or dwelling unit. The ballots Canterwood used were not sophisticated and could have easily been photocopied. And a single person could cast multiple votes if they owned more than one property or were serving as a proxy for several others. *See also, e.g.*, RCW 64.38.120(3)(b) ("If only one of several owners of a lot is present [at a meeting], that lot owner is entitled to cast all the votes allocated to that lot."); (5)(a) ("Votes allocated to a lot may be cast pursuant to a directed or undirected proxy."). We conclude that private elections to the board of a homeowners' association are different than government elections for public office and the principles and definitions established in title 29A RCW do not apply to Canterwood's elections.

B.      Principles for Interpreting Canterwood's Governing Documents

In addition to the requirements of chapter 64.38 RCW, Canterwood's notice and ballot procedure needed to comply with the association's governing documents. *See Hartstene Pointe Maint. Ass'n v. Diehl*, 95 Wn. App. 339, 345, 979 P.2d 854 (1999); *Parker Ests. Homeowners Ass'n v. Pattison*, 198 Wn. App. 16, 27, 391 P.3d 481 (2016). "[H]omeowners' associations must be given room to interpret and apply their own governing documents as long the result is neither

11

arbitrary nor unreasonable." *Parker Ests.*, 198 Wn. App. at 31 (holding that the association could interpret its own bylaws to remedy a situation where a quorum of members did not vote to elect a board). "If an organization's rules are conflicting and confusing, we are more likely to find its interpretation neither arbitrary nor unreasonable." *Id.* at 28.

C.      Whether Canterwood's Procedures Complied with Former Chapter 24.03 RCW, Chapter
        64.38 RCW, and Canterwood's Governing Documents

Canterwood's governing documents required it to mail notice of the annual meeting and election "to each member entitled to vote thereat," to the address "supplied by such member." CP at 153. The governing documents provided that all owners of a lot or dwelling unit were members and that the single vote for each lot or dwelling unit "shall be divisible and exercised as the owners determine, but in no event shall more than one vote be cast with respect to any dwelling unit." CP at 120; *see* CP at 147. Canterwood's standard election practice was to mail a single notice and ballot to each lot or dwelling unit, addressed to all owners.

1.      Whether Canterwood's notice complied with the statutes and governing documents

Because Canterwood held an election that was separate from its members' meeting, it had to "notify the owners that the vote [would] be taken by ballot," RCW 64.38.120(6), by mailing the notice to the address provided by "each member entitled to vote." CP at 153; *see* former RCW 64.38.110(2)(a). But "[t]he ineffectiveness of a good faith effort to deliver notice by an authorized means does not invalidate action taken at or without a meeting." Former RCW 64.38.110(5). Similarly, former RCW 24.03.080(1) required that written notice of a meeting had to be "delivered . . . to each member entitled to vote at such meeting."

It is undisputed that Brain and Herzog both lived at the address the notice and ballot were mailed to, and the envelope containing the documents was addressed to both owners. Nothing in

the notice was addressed in a way that would exclude either owner. The notice explained that the annual meeting would be remote due to the COVID-19 pandemic, that voting in the election would be by ballot, how to vote, and that attending the meeting was not required to have one's vote counted. Brain has not shown how a single notice mailed to the designated address of owners who live together would not be effective. And even if the notice was ineffective, he has not shown that the attempted notice was not in good faith. *See* former RCW 64.38.110(5).

We hold that there is no genuine dispute of material fact that Canterwood's notice procedure complied with the governing documents in the 2020 board election and complied with the governing documents and the applicable statutes for the 2021 board election.

2. <u>Whether Canterwood's ballot procedures complied with the relevant statutes and governing documents</u>

Brain contends that each individual owner of a Canterwood property was entitled to receive a separate ballot in the board elections. He argues, that the association must deliver a separate ballot to every owner, rather than providing one ballot per lot or dwelling unit. We disagree.

a. Fractional voting

Canterwood maintains that its governing documents "allow only one vote to be cast per lot, not multiple ballots consisting of fractional votes." Resp't's Br. at 13. We disagree, but we also conclude that Canterwood followed the required balloting procedures in both the 2020 and 2021 elections.

Canterwood's governing documents provide that a lot's "vote . . . shall be divisible and exercised as the owners determine, but in no event shall more than one vote be cast with respect to any dwelling unit." CP at 120. The dictionary defines "divisible" as "capable of being or liable to be divided or separated." WEBSTER'S THIRD NEW INT'L DICTIONARY 664 (2002). Consistent

13

with this definition, Canterwood's management has previously taken the position that, "We all agree [that Canterwood members] have a right to vote fractionally. . . . Should someone request to do so[,] [t]hey can." CP at 57. We conclude that use of the term "divisible" plainly means that a vote can be split if the co-owning members wish. Further, Canterwood's arguments that fractional votes would "simply cancel each other out" does not hold true when the board elections involved votes for multiple people from a list, not just a vote between two people. Resp't's Br. at 15-16.

Even so, as discussed below, Brain has not established that each owner must have received a separate ballot in order for the 2020 and 2021 board elections to be valid.

b.      Each owner's right to vote

Brain reasons that "[t]he ordinary meaning of the term 'ballot'" is "evidence of the vote of a single *individual* entitled to cast a vote." Appellant's Opening Br. at 13 (emphasis added). But the dictionary defines "ballot" solely in relation to *votes*, not the individual casting the vote. The dictionary definitions of "ballot," are as follows:

> 1 a: a small ball dropped into a box or urn in secret voting
>       b: a ticket or sheet of paper (as one printed with the candidates' names or the proposition to be voted on) used to cast a secret vote (as during public elections)
> . . .
> 2 a: the action or system of secret voting by the use of ballots or by any device for casting or recording votes (as a voting machine)
>       b: the right to vote in such a way . . .
> 3: the whole number of votes cast at an election
> 4: the drawing of lots.

WEBSTER'S THIRD NEW INT'L DICTIONARY 168 (2002). Thus, nothing about the ordinary meaning of the term "ballot" prohibits multiple people from filling out a single ballot in a homeowners' association board election, especially when the association's governing documents limited all the co-owners of a single property to one vote. Co-owners who wished to split their vote could have

14

requested another ballot for fractional voting, copied their ballot and indicated they wished to cast a fractional vote, or handwritten fractional votes on a single ballot. There is nothing in the record indicating that Canterwood ever rejected ballots doing any of the above or previously committed to rejecting ballots voted in any of these ways before Brain's lawsuit.

Next, Brain contends that language in chapter 24.06 RCW requires "each member . . . shall be entitled to one vote." Appellant's Opening Br. at 5-6 (quoting RCW 24.06.110). As discussed above, chapter 24.06 RCW does not apply because Canterwood was incorporated under former chapter 24.03, which was in effect until after the 2021 election. The applicable statute, former RCW 24.03.085, provided, "The right of the members . . . to vote may be limited, enlarged or denied to the extent specified in the articles of incorporation or the bylaws. *Unless so limited*, enlarged or denied, each member . . . shall be entitled to one vote on each matter submitted to a vote of members." Canterwood's governing documents specified that "in no event shall more than one vote be cast with respect to any dwelling unit." CP at 120. Thus, the fact that the governing documents limit all the owners of a single dwelling unit to one vote meant that former RCW 24.03.085 did not entitle each individual member to their own vote.

Brain also asks us to look to the governing documents' standards for establishing when a quorum of members was present for a meeting. A quorum was present if "members or proxies *entitled to cast* one-tenth (1/10) of the votes" attend a meeting. CP at 154 (emphasis added). Brain reasons that meeting the quorum requirement depends on the number of members present, not the number of votes that can be cast. "The number of members entitled to [vote] is based on the number of owners, all of whom are entitled to vote." Appellant's Opening Br. at 18. Thus, he reasons that we should assume each member was entitled to vote, even if only fractionally. But hypothetically,

15

a meeting attended by less than one-tenth of Canterwood's members could reach the quorum threshold if those present were entitled to cast votes for multiple properties by virtue of being proxies for or owning multiple properties. The documents do not require a specific number of members to be present to establish a quorum, only enough people to *represent* one-tenth of the voting properties. The quorum provision therefore does not require each owner to receive a separate individual ballot.

We must give homeowners' associations "room to interpret and apply their own governing documents as long the result is neither arbitrary nor unreasonable." *Parker Ests*., 198 Wn. App. at 31. Even viewing the facts and inferences in the light most favorable to Brain, Brain has not established that sending a single ballot addressed to all the owners of a property was arbitrary or unreasonable when no member had asked to exercise their right to vote fractionally.

There is no genuine dispute of material fact that Canterwood's balloting procedure complied with the governing documents in the 2020 board election. And there is no genuine dispute of material facts that Canterwood's balloting procedure complied with the governing documents and the applicable statutes for the 2021 board election.

We affirm the trial court's order denying Brain's motion for summary judgment and granting Canterwood's.

## ATTORNEY FEES

Canterwood seeks appellate attorney fees under RAP 18.1 and RCW 64.38.050. RAP 18.1(a) allows us to award appellate attorney fees when "applicable law" permits. And RCW 64.38.050 provides, that a court adjudicating a dispute under that chapter "in an appropriate case, may award reasonable attorneys' fees to the prevailing party." Brain's action was premised under

No. 57716-0-II

chapter 64.38 RCW and Canterwood is the prevailing party on appeal. Thus, we award Canterwood appellate attorney fees.

CONCLUSION

We affirm and award Canterwood attorney fees in an amount to be determined by a commissioner of this court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Glasgow, C.J._
Glasgow, C.J.

We concur:

_Maxa, J._
Maxa, J.

_Price, J._
Price, J.

17